MaddeN, Judge,
delivered the opinion of the court:
We have this case pursuant to a Resolution of the House of Representatives requesting us to report to it our findings of fact and our conclusions as to whether the plaintiffs have a claim, legal or equitable, against the United States.
The facts are set forth in detail in our findings, and need not be repeated here at length. They show that the plaintiffs were presented with what seemed to be an opportunity to acquire a one-third interest in a promising enterprise in return for the use of $150,000 of their money for only a few months. The $112,500 which went to the Government was tendered by them and their associates in the hope that so large *525 a tender would make it more likely that their offer of $750,000 would be accepted. When the offer was not accepted, fair dealing on the part of the plaintiffs’ associates would have caused them to consult the plaintiffs as to whether they were willing to risk their $112,500 in a much larger offer. They were not consulted, however, until the offer had been made, and their money tendered with it. It is altogether likely that if, when they learned of this, and the Government had not yet accepted the offer, they had objected and demanded the return of their money, they could have gotten it back. Again, however, they were persuaded by their associates that the transaction would be a profitable one, and they consented to it.
When the Government accepted the offer of $1,800,000, it stipulated that the $112,500 which it had in its possession could be kept by the Government as liquidated damages if the rest of the $1,800,000 was not paid. The Government had the right to insert in the contract any reasonable provisions which it chose. It was prudent of it to require security for performance of the contract, since, as the event proved, the contract might tie up the property for several months and still never be completed by payment.
The plaintiffs say that the agreement that the $112,500 should be retained as liquidated damages was a stipulation, not for liquidated damages, but for a penalty, and was therefore illegal. If the Government had not had the money in its hands when the contract was under consideration, and had said to the offeror that its offer would be accepted if it would deposit $112,500, which would be retained as liquidated damages if the contract was made but was not performed by payment, and the $112,500 had then been deposited with the Government, one could not say that the required deposit was so large that it exceeded the possible or even probable damage to the Government which would result from a failure to pay the rest of the agreed price. In the autumn of 1949, when the contract was made, there was no market for this plant, and it is altogether likely that if the time for payment had not been extended far into 1950, but an attempt had been made to resell the property in late 1949 or early 1950, the resale would have had to be at a reduction of much more *526 than $112,500 from the $1,800,000 which the plaintiffs’ company had agreed to pay. We cannot say that the sum agreed to was a penalty and was not a lawful provision for liquidated damages.
The circumstance that the sum which the Government stipulated as the amount of liquidated damages was $112,500 and not some considerably smaller sum, was an accident. If the prior offer of $750,000, with its unusually large percentage of good faith money attached, had not occurred, there is no likelihood that the plaintiffs’ check for $112,500 would ever have been written or tendered. When the Government invited bids, and the plaintiffs’ company submitted the bid for $1,800,000 which was accepted, the invitation for bids required only that bids be accompanied by payments of 1 percent of the amount of the bids. That would have been $18,000 in the case of the bid of the plaintiffs’ company. Since the offer was for a cash purchase, it is not likely that the Government would have required an additional down-payment in addition to the $18,000 to be retained as liquidated damages in case of default. From the conduct of the Government in later attempts to sell the property, it may reasonably be concluded that the sum so required by the Government would not, in any event, have been more than $50,000.
The fact that the property in question never was sold, but remained the property of the Government, was also an accident, and a most fortunate one for the Government. The delay and ultimate default of the plaintiffs’ company postponed other efforts to sell the plant so long that, before any sale was closed, the Government needed the property for defense purposes and took it off the market. It continued to grow in value and is now worth many times what the plaintiffs’ company agreed to pay for it.
CONCLUSION
Our conclusion is that the plaintiffs have no claim, legal or equitable, of a kind which could be enforced in court. Whether, in the circumstances, Congress should provide for a payment to the plaintiffs is, of course, a question for Congress alone.
*527 The opinion, findings of fact, and conclusion reached will be certified to Congress pursuant to House Resolution No. 309,84th Congress, adopted July 30,1955.
Laramore, Judge, concurs.
Jones, Chief Judge,
made the following additional comment:
I agree completely with the facts as found by the majority, and since there was no privity of contract I agree that there is no liability either legal or equitable on the part of- the defendant.
Since, however, the highest liquidated damage provision that defendant included in any of its requests for bids was $50,000, and since subsequent events clearly showed that defendant was fortunate in the fact that no sale was finally consummated, I would recommend that Congress consider returning that part of the deposit that is in excess of $50,000, inasmuch as the latter amount is abundantly sufficient to compensate the defendant for both the expense and trouble caused by the failure of the American Steel and Tube Corporation to consummate its agreement. In other words, I would recommend the payment of $62,500 to the Taylors, even though it is largely in the nature of a gratuity.
Whitaker, Judge, and Littleton, Judge, join in the foregoing comment.
findings of fact
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes the following findings of fact:
1. House Resolution 309, 84th Congress, adopted July 30, 1955, provides as follows:
Resolved, That the bill (H. R. 7453) entitled “A bill for the relief of Richard M. Taylor and Lydia Taylor,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giv *528 ing such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
2.H. B. 7453, 84th Congress, 1st session, which has been referred to this court provides, in pertinent part, as follows:
* * * the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Bichard M. Taylor and to Lydia Taylor, of Zanesville, Ohio, the sum of $112,500. Such sum represents the amount equitably due from the United States to the said Bichard M. Taylor and the said Lydia Taylor by reason of the retention by the United States of a deposit made in connection with the proposed but unconsummated sale of the Scullin Steel Company, Plancor Numbered 1672. The United States has retained such deposit even though it was greatly benefited by the fact that the sale was not finally consummated: * * *
3. Plaintiffs, husband and wife, are citizens of the United States and residents of Zanesville, Ohio.
4. General Services Administration (hereinafter referred to as the Administration) is an agency of the United States Government.
5. The American Steel & Tube Corporation (hereinafter referred to as the Corporation), was formed February 21, 1949, as a Delaware corporation to acquire a surplus steel plant in East Chicago, Indiana, from the Govermnent and to operate it.
6. Officials of the Corporation learned in the spring of 1949 that Plancor 1672 was available for purchase from the Government which had declared it surplus property. Plan-cor 1672, known as the South Plant, Scullin Steel, at St. Louis, Missouri, was built in 1943. It consisted of buildings, machinery, and equipment on approximately 15 acres of land. The equipment included four 40-ton open hearth furnaces and an electric furnace. The foundry contained the necessary equipment for producing approximately 72,000 tons per year of steel castings. In addition, it had numerous heat-treating furnaces and auxiliary equipment, a machine shop, a powerplant, a railroad siding and other facilities. The *529 plant had been operated during World War II by Scullin Steel Company under lease from the Government. It was advertised for sale by the Government in the fall of 1945 but no bids were received at the cut-off date on December 17, 1946. A portion of the facilities was leased for the production of steel ingots from September 1948 to July 1949.
7. Negotiations for the purchase of Plancor 1672 were started by the Corporation with Government officials in July or August 1949. The Corporation’s plan was to convert the plant to the manufacture of tubular steel products, particularly oil-well casing. It proposed to sell off the equipment in the plant which would not be usable in the manufacture of tubular goods. The president of the Corporation believed that Plancor 1672 could be bought by the Corporation if an offer in the amount of $750,000 was submitted with a down-payment of 15 percent, or $112,500.
8. In September 1949, Richard M. Taylor, an elderly gentleman in semiretired status, who was occupied in handling his and his wife’s real estate investments in Zanesville, Ohio, was introduced by one of his tenants to a Mr. Harrington, an officer of the Corporation, and, in turn, to other officers of the Corporation. This was Mr. Taylor’s first contact with these men or with the Corporation. Mr. Taylor was told by the officers of the Corporation that Plancor 1672 had been offered to the Corporation by the Government for $750,000 and that the Corporation had accepted the offer but would be required to make a downpayment of $112,500 before the plant could be taken over. The Corporation was completely without assets and Mr. Taylor was asked to loan it $150,000 so that the purchase could be made.
9. Mr. Taylor was informed by Mr. Gathmann, president of the Corporation, that Plancor 1672 contained a great deal of equipment which would not be necessary in the proposed manufacture of tubular steel products and, therefore, would be sold. He was also told that arrangement had already been made to sell the excess equipment and he would be repaid in full immediately from the proceeds of such sales.
10. In reliance upon representation of the Corporation’s officers that the plant was to be purchased for $750,000 and that they would be repaid within a short time from the sale of *530 excess equipment, Mr. and Mrs. Taylor loaned the Corporation $150,000, of which $100,000 was from Mr. Taylor and $50,000 from his wife. $112,500 was in the form of a certified check, dated October 4,1949, drawn by Mrs. Taylor and payable to the Government, for use as the downpayment on the purchase price, and the balance of $37,500 was deposited to the account of the Corporation to be used as working capital. The Taylors received the Corporation’s note in the amount of $150,000 payable within four months with 6 percent interest. The stock of the Corporation was placed in escrow with an agreement that the Taylors would retain a one-third interest in the Corporation after the note was paid. The other stockholders agreed to make Mr. Taylor a director and treasurer of the Corporation. He was elected to both these offices.
11. On October 4, 1949, the Corporation submitted to the Administration an offer of $750,000 for Plancor 1672. It was accompanied by the certified check for $112,500 drawn by Mrs. Taylor as a downpayment. The offer stated that the balance would be paid in ten equal annual installments, with the right of prepayment without penalty.
12. On October 26, 1949, the General Services Administrator (hereinafter referred to as the Administrator) declined as inadequate the Corporation’s offer of $750,000, as well as an offer in the same amount by another party. Mr. Gathmann, the Corporation’s president, was told the Corporation’s offer was rejected because other people wanted the plant. Mr. Gathmann, in connection with the offer, submitted information to War Assets General Services Administration under date of October 19,1949, including a pro forma balance sheet as of September 1949 showing actual cash in bank of $150,112. This information was erroneous.[1]
13. On October 31, 1949, the Administration invited the Corporation to submit a new purchase proposal. Identical invitations were sent to about 15 other prospective bidders. Under “Terms of Payment” the invitation provided:
*531 A minimum downpayment in the * * * amount of 1% of the proposed purchase price stated in the proposal must accompany the proposal.
Credit terms can be arranged, with the balance of the agreed downpayment due upon acceptance of the Letter of Intent.
14. The National Security Clause under which the Government would have been allowed to take back the plant in time of national emergency had previously been removed from Plancor 1672 by the Munitions Board. The proposed sale was free of any restriction or provision as to future use.
15. On November 11, 1949, the Corporation submitted a proposal to purchase the plant for $1,800,000 cash. The Taylor certified check for $112,500 (which had been retained by the Government when the offer of $750,000 was rejected) was used as a bid deposit on the offer of $1,800,000, even though it was far in excess of the $18,000 which was the required minimum bid deposit. The Corporation at the same time submitted an offer to buy the plant for $2,025,000 on a time-payment basis.
16. The proposals of the Corporation to purchase for $1,800,000'cash, or $2,025,000 on a time-payment basis, were the only bids submitted for Plancor 1672 in its entirety. The only other bid, by W. C. Hill of St. Louis, Missouri, was held not to qualify because it was for only a part of Plancor 1672. No bid deposit had been submitted with the Hill offer.
17. On November 22, 1949, the Director, Industrial Peal Estate Disposal Division, War Assets, joined with other officials of the Administration in a formal report to the Liquidator, War Assets, recommending the sale of Plancor 1672 to the Corporation for $1,800,000. On the basis of the report, the recommendation for sale to the Corporation for $1,800,000 cash was approved by the Liquidator on November 22, 1949. The conditions of sale which were recommended to the Liquidator for adoption did not include any provision for retaining the bid deposit as liquidated damages in event of default.[2]
*532 18. On November 23,1949, the Administration notified the Corporation by telegram of its approval of the sale to it of Plancor 1672 for $1,800,000. The telegram included the identical terms and conditions of sale as were contained in the report on the basis of which the Liquidator approved the sale with one exception. Instead of merely restating the provision, “1. Terms: All cash on closing”, as contained in the report, the telegram stated: “1. Terms — all cash on closing. If sale is not consummated by reason of purchaser’s default, purchaser’s bid deposit of $112,500 shall be retained by the seller as liquidated damages.”
19. The telegram of November 23,1949, also stated, “Compliance with requirements of War Assets Regulation 5. Regulation 5 shall not, however, be interpreted in such manner at [sic] to deter purchaser from disposal of personality [sic] not required in connection with the operation of the property as a tube mill, as described in the plan of operation made a part of the proposal dated November 11, 1949.”
20. Prior to the telegram of November 23,1949, there had been no discussions or negotiations between the Corporation and the Government with respect to the inclusion of a provision that, in the .event the sale was not consummated, the deposit would be retained as liquidated damages. Even then officials of the Corporation made no mention of the liquidated damage provision. They were confident that financing would be readily available and they did not anticipate their inability to consummate the contract.
21. Neither Mr.' nor Mrs. Taylor knew that the offer of $1,800,000 had been made by the Corporation, or that their check for $112,500 was applied on that offer until after the award was made. They learned of it the first time when they read about the award in a Zanesville paper. Mr. Taylor objected at a corporate meeting to the Corporation having made the new offer, but he agreed to it after he was told by other Corporation officials that an insurance company had agreed to loan the Corporation $1,500,000, and that about $350,000 to $475,000 would be received for the surplus equipment which was not necessary in the operations of the proposed tube mill. He did not check on the accuracy of the statements by the corporate officials, but he felt assured that *533 with these moneys available to the Corporation, he would be repaid the loan of $150,000 within a week after the Administration approved the sale to the Corporation.
22. Mr. Taylor does not recall being aware that the $112,500 deposit made by the Corporation would be retained in full as liquidated damages in the event the contract with the Government was not consummated, although he had opportunity as an officer and director of the corporation to be apprised of these matters.
23. On November 26, 1949, the Corporation advised the Administration of its acceptance of the award.
24. On December 5,1949, the Administration and the Corporation entered into a Letter of Intent for the purchase by the Corporation of said Plancor 1672 for $1,800,000. The purchase price was to be paid in cash, less the amount of the deposit of $112,500, by February 15, 1950. The Letter provided that, if the sale should fail of consummation by reason of the Corporation’s default, the deposit of $112,500 was to be retained by the Government as liquidated damages.
25. Mr. Taylor did not sufficiently inform himself as to be aware that the Corporation could not sell the equipment not usable in a tube mill until the entire amount of the $1,800,000 purchase price had first been paid to the Government.
26. The Corporation entered into two agreements in December 1949 to sell the excess equipment, in one case for $350,000 and a share of the profits on resale, and in the other instance for a flat $350,000, subject to the Government’s approval. The Government refused to approve the sale of the excess equipment and it was not completed.
27. A deed and bill of sale to Plancor 1672 were tendered by the Administration to the Corporation on January 9,1950. Pursuant to the latter’s requests, in order to enable it to make financial arrangements to obtain the balance of the purchase price, the date for the closing of the transaction was extended several times.
28. The Corporation had an engineering concern make a ten-day survey of Plancor 1672 to determine what would be necessary to put the plant into operation.
29. Messrs. Gathmann and Taylor attempted, through many bankers and brokerage houses in various parts of the *534 country, to obtain the necessary financing to complete the purchase of the plant. When, on April 14,1950, the Corporation was still not able to raise the money to consummate the purchase, the Administration notified the Corporation that its rights under the Letter of Intent were terminated and that its bid deposit of $112,500 was being retained by the Government as liquidated damages.
30. Immediately after the default, the Administration sent telegrams to a number of prospective purchasers, inviting bids for the purchase of Plancor 1672. The telegrams stated: “Such bids may be (1) for the entire facilities for unrestricted use in place or for dismantlement, (2) for the equipment for removal and use or resale, or (3) for the land and buildings without equipment.” No bid deposit was required and no mention was made of any liquidated damage provision.
31. At the opening of bids on May 9, 1950, 38 bids were received from 30 separate bidders. The highest bid received was from Atlantic Investors, Inc., of Washington, D. C., in the amount of $2,125,000 payable 10 percent down and the balance over 10 years at 4 percent, and the next highest bid was from Ace Engineering Corporation, of St. Louis, Missouri, in the amount of $1,750,000, but the terms of payment were not set out in the bid. All 38 bids were rejected on May 31,1950. The reasons for such rejection do not appear in the record.
32. New bids were solicited on or about June 2, 1950, for Plancor 1672, either “For use in place” or “For dismantlement and salvage.” The invitations to bid established a cutoff date of June 20, 1950, and stated that bids must be accompanied by a cashier’s check or certified check for $50,000 to be “applied as a downpayment on the purchase price in the case of a successful bidder. In the event of default on the part of a successful bidder in consummating the purchase, the bid deposit will be retained by the Government as liquidated damages.”
33. In response to the new solicitation of bids, Missouri Steel Corporation, through its attorney, submitted a bid on June 20, 1950, to purchase Plancor 1672 for $1,857,951.11 *535 cash, accompanying the bid with a check for $50,000 as a deposit and a promise to have the check certified by June 22, 1950. The invitation had required that only cashiers’ checks or certified checks would be accepted as deposit. Missouri Steel Corporation proposed to operate Plancor 1672 in place, converting it into a tube and pipe mill at the earliest practicable date. A bid was also received from Samuel Sons Iron and Steel Company, Inc., in the amount of $1,666,666, proposing to dismantle and salvage Plancor 1672.
34. On June 22,1950, before the Administration could act on any of the bids received on June 20,1950, the Administration received from the Munitions Board a request that the National Security Clause restrictions be reimposed on Plan-cor 1672 in order to preserve its production for castings in the event of an emergency. On June 23,1950, the Administration certified to the Munitions Board that Plancor 1672 was undisposable with the National Security Clause restrictions thereon. A request was made that the Administration be directed to transfer the property to the National Industrial Reserve under the provisions of Public Law 883, 80th Congress. This direction was duly given on June 23, 1950, and the plant was transferred to the National Industrial Reserve on July 1, 1950.
35. Since the Munitions Board instructed the Administration to reject all bids and dispose of the plant only subject to National Security restrictions, the Administration rejected all the sealed bids which were opened on June 20, 1950 for Plancor 1672 and returned the checks which had been submitted as bid deposits. Among the bids rejected was the Missouri Steel Corporation’s offer to pay $1,857,-951.11 in cash for the plant.
36. Sales of all surplus property, including Plancor 1672, were then held in abeyance pending a reexamination by the Department of Defense and other Government agencies as to the possible need for such property under the then existing emergency conditions occasioned by the Korean conflict.
37. On October 4,1950, the Munitions Board informed the Director of the National Industrial Reserve, who had cus *536 tody of Plancor 1672, that it had been advised by the Department of the Army that the reactivation of the plant was necessary to meet requirements for heavy armored castings in connection with the tank production program. A survey had shown that sources for large armored castings of 1,500 pounds and over were then very limited. Accordingly, the Munitions Board requested necessary action to provide the Department of the Army with occupancy of Plancor 1672 so that the facility could be operated for the production of heavy armored castings.
38. With very minor adjustments, Plancor 1672 was adaptable in the fall of 1950 to the production of hulls and turrets for tanks.
39. On November 3, 1950, the Department of the Army took over the plant for the Chief of Ordnance. From that time until 1954, it was operated by Scullin Steel Company as a contractor of the Ordnance Department for use in making heavy tank turrets. In 1954, it was placed on a standby basis with Scullin Steel Company as a standby operator. Plancor 1672 continued to the date of the hearing to be the property of the Government.
40. a. The value of Plancor 1672 in the fall of 1950 was greatly in excess of its value in the fall of 1949 when the Letter of Intent with the Corporation was signed. The fair value of the plant in the fall of 1950 for its designed use in the production of steel castings was about $10,000,000. The reproduction cost less depreciation of the plant at that time was about $15,000,000. If the plant had been dismantled, the salvage value of the equipment would have been $2,100,000 in the fall of 1950, the market values of machinery and equipment having doubled between the fall of 1949 and the fall of 1950. Added to this would have been $2,592,000 (432,000 square feet times $6 a square foot), the fair value of the real property for general industrial use in the fall of 1950. In May 1956, when the hearing in this case was held, the fair value of the plant as a foundry for the production of steel castings, was about $23,000,000.
b. The only witness on valuation was a highly qualified appraiser offered by plaintiff, and the values given here are his values, there being no other basis of comparison afforded by *537 the record. The “fair value” referred to is not to be confused with “market value”. Fair value is a figure which a willing buyer and a willing seller, neither under compulsion to buy or sell, should be willing to pay for a specific property. Fair value cannot always be realized. It may be more or less than market value, the latter being a competitive figure which in the open market a specific property would bring under all the existing cicumstances. The market value of Plancor 1672 was not stated by the witness. There was no appreciable market for such property from the fall of 1949 up until the outbreak of the Korean war in late June 1950. The market value of the Plancor 1672 in the fall of 1950 was less than its reproduction cost depreciated value of $15,000,000 at that time, because there were then some other plants available for purchase.
c. Under date of October 24,1949, the Appraisal Division of War Assets, General Services Administration, had found and recommended the following values:

SUPPLEMENTARY VALUATION FINDINGS
Fair value as set forth above is the estimated value of the Plancor for its designed use in the production of steel castings. The proposals submitted envision the use of the facilities for the production of tubular products. The value for such use is as follows:
Value of property usable for a tube plant_$4,000, 000
Removal value of surplus material_ 598, 000
Total_ 4, 596,000
Value of $4,000,000 for Seamless Tube Production is the estimated value predicated on conversion of the plant for utilization in producing tubes. For such utilization, some minor buildings and foundry production equipment will be unessential for the contemplated use. This surplus equipment is identified by a listing thereof on file m the Appraisal Division.

*538

The valuation of $4,000,000 represents the value for alternate utilization with appropriate adjustment to reflect the overdevelopment and obsolescences of the property as a whole for reconversion from “melt to cast plant,” to “melt to forming plant.” Reflected in this adjustment of valuation are costs to be incurred for rehabilitation and adaptation of the facilities for the alternate use.
41. The Corporation is no longer in existence, its charter having been declared void on April 1,1952, for failure to file annual reports and pay taxes in Delaware.
42. The Corporation had no assets of any kind when the Taylors made the loan to it in September 1949, and thereafter at no time acquired any assets other than the $150,000 which was put up by the Taylors. The plaintiffs were the only creditors of the Corporation.
43. The insolvent Corporation gave the Taylors a power of attorney to collect the deposit from the Government and assigned to them any and all rights to the refund of $112,500.
44. The plaintiffs have never received back any part of the bid deposit of $112,500 or indeed any part of the $150,000 which had been loaned to the Corporation. The sum of $37,500, which was the balance of the $150,000 Taylor loan over the deposit of $112,500, was used for engineering fees, office, and other expenses of the Corporation.
*539 45. On April 27,1950, plaintiffs asked the Administration to refund the deposit of $112,500. On July 25,1950, the claim was rejected by the Administration.
46. Private bills, H. E. 2639 and S. 1197, were introduced in the 82nd Congress for the repayment of the $112,500 bid deposit to the plaintiffs. The Administration submitted an adverse report on those bills.
47. The Administration stated that it would recommend favorably on a private bill for the difference between the amount of the deposit and the Government’s out-of-pocket costs between the date of the Letter of Intent and the date of the default. These out-of-pocket costs were found by the Administration to have been $24,111.62. Accordingly, Senator Taft and Congressman Secrest, sponsors of the private relief bills, were notified that the Administration would recommend favorably on a private relief bill in the amount of $88,888.38. Bills H. E. 5995 and S. 227 were thereupon introduced in the 83rd Congress, which sought the repayment of $88,388.38 to the plaintiffs. The record does not show what, if any, action was taken on these bills in the 83rd Congress.
48. As stated in findings 1 and 2 above, H. E. 7453 was introduced in the 84th Congress to authorize the repayment of the full deposit of $112,500 to plaintiffs. A resolution, H. Ees. 309, was passed by the House of Eepresentatives referring H. E. 7453 to this court for a report on the nature and character of the plaintiffs’ demand, and the amount, if any, legally or equitably due from the United States to the plaintiffs.

 Defendant feels that Gathmann deliberately deceived General Services Administration Into thinking the corporation was more solvent than it was. However, it should be noted that a "pro forma" balance sheet differs from an actual balance sheet in that it may portray something other than an actual financial condition.

 The report in question was, oí course, intradepartmental, and did not pass between the parties to the prospective contract so far as is disclosed.