Per Curiam:
This case was referred pursuant to Eule 37(e) to Herbert N. Maletz, a trial commissioner of this court, with directions to make his recommendation for conclusion of law on defendant’s motion for summary judgment. The commissioner has done so in an opinion filed August 6, 1962. Plaintiff sought review of the commissioner’s opinion and recommendation for conclusion of law, briefs were filed by both parties and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore *457 not entitled to recover. Defendant’s motion for summary judgment is granted and plaintiff’s petition is dismissed.
OPINION OP COMMISSIONER
Plaintiff seeks to recover a bid deposit of $10,397.50 which, the defendant retained as liquidated damages for nonperformance of certain obligations. The case comes before the court on defendant’s motion for summary judgment.
A brief explanation of the Capehart Act,[1] under which the controversy arises, will be helpful in understanding the background events leading to the present suit. In essence, that Act is designed to provide housing for armed services personnel without the use of appropriated funds. To accomplish this objective, the Act provides for construction of housing projects on Government-owned property, pursuant to competitive bidding by private builders using private mortgage financing insured by the Federal Housing Administration (FHA) and guaranteed by the Military Departments. When the project is completed, the Department is responsible for amortizing the mortgage debt, including the payment of interest thereon, by the use of annual military appropriations for quarters allowances of service personnel. The Department is also responsible for maintenance and operation of the project after completion.
The procedure for carrying out the statutory design is as follows: The Department issues invitations to bid. When bids are received, the Department, after consultation with the FHA, determines who has submitted the lowest acceptable proposal and issues to that bidder (who is referred to as the “eligible builder”), a “Letter of Acceptability”. This Letter requires the eligible builder to take four actions: First, he must organize a Delaware corporation which is referred to as the “mortgagor-builder”; second, he must make arrangements with an acceptable mortgage lender for financing the total cost of the project, including profit; third, he must cause the mortgage lender to obtain an FHA commitment for insurance; fourth, he must execute a three-party Housing Contract which defines the rights and obligations *458 of the Department, the eligible builder, and the mortgagor-builder. The Letter of Acceptability also requires the Department to execute a lease of a project-site to the mortgagor-builder.
Once the foregoing arrangements are made, the parties in interest effect a “closing” at which the mortgagor-builder delivers to the mortgagee a note, together with a mortgage securing the same, which bears a prescribed rate of interest. The eligible builder deposits in escrow with the mortgagee the capital stock of the newly formed mortgagor-builder corporation for ultimate delivery to the Department, and delivers to the Department certified checks covering the cost of design, supervision, administration, and inspection of the project.
Thereafter, pursuant to the Housing Contract, the eligible builder causes the project to be constructed and is paid therefor entirely out of mortgage proceeds. All profits under the Housing Contract accrue to the eligible builder. As construction progresses individual housing units are placed under control of the Department. Determination as to completion of the project is made by the FHA which then issues a final endorsement of the mortgage note for mortgage insurance. When the project is completed, the capital stock of the mortgagor-builder is delivered to the Department by the mortgagee as escrow agent, and payment of the mortgage indebtedness of the mortgagor-builder is undertaken by the Department.
Against this background, the record before .the court on the motion for summary judgment shows that the following pertinent facts are undisputed: On October 20, 1958, the U.S. Army Engineer District, New York, issued a bid invitation for construction of a 32-unit Capehart housing project at Grand Island, N.Y., with a bid opening scheduled for November 20. Under the terms of the Invitation, the eligible builder was required to obtain financing for the project by a 25-year mortgage at an interest rate of 4%% per annum to be insured by the FHA. The Invitation also contained these pertinent clauses:
“3. The Department reserves the right to reject any and all bids when such rejection is in the interest of the *459 Government; to reject the bid of a bidder who has previously failed to perform properly or complete on time construction of a similar nature; and to reject the bid of a bidder who is not, in the opinion of the Contracting officer, in a position to perform the contract. The bids will be evaluated on the basis of providing the maximum usable combination which may be obtained within the maximum mortgage amount stated in the FHA Appraisal and Eligibility Statement as determined by the greater cost of the base bid plus each additive or portion of an additive item in the additive priority stated in the bid schedule . . .
* * * * *
“8. Each bidder is required to submit with his bid a certified check in the amount of 2 percent of the FHA estimated replacement cost but not to exceed $25,000 nor be less than $5,000, payable to the Treasurer of the United States, to insure that if he is the lowest acceptable bidder he will effect a closing with FHA within the time prescribed in the Letter of Acceptability. In the event the lowest acceptable bidder fails to effect a closing with FHA within the time prescribed, his deposit will be forfeited and become the property of the Department as liquidated damages unless the Department finds that he has made every effort to effect such closing and extends the time to effect such closing. If the lowest acceptable bidder effects a timely closing with the FHA the amount of his deposit will be refunded to him at the closing with the FHA. The deposits of unsuccessful bidders will be returned to them not later than 60 days after the opening of the bids. Each prospective bidder is advised that the failure to submit such certified check with his bid will render his bid defective and will be cause for its rejection.
*****
“33. Prospective bidders are informed that. FNMA money may not be available and private financing must be obtained by the bidder for both interim and long term loans. Prior to the issuance of a letter of acceptability bidders will be required to indicate the source of their financing and show evidence of their ability to complete all administrative and financial arrangements for a contract closing within 60 days after the issuance of the letter of acceptability. The Government reserves the right to reject any eligible bidder where such bidder fails to effect closure within 60 days after issuance of the letter of acceptability, or within such additional *460 period as might be approved by the Contracting Officer where warranted by the circumstances.”
A “Notice to Bidders” which was included with, but did not constitute part of, the Invitation, cautioned bidders that the “Federal National Mortgage Association will be unable to make further commitments to purchase long-term mortgages under the Capehart housing program and bidders should therefore submit a bid for this project only if interim and long-term financing will be obtainable from sources other than FNMA.”
Concurrently with the Capehart Bid Invitation, the Corps of Engineers issued a companion Invitation for “off-site” construction of access roads, utility lines, etc. to service the housing project, payment for which was to be effected from funds appropriated to the Corps of Engineers. The off-site bid opening was scheduled for November 20, the same day as the opening on the Capehart project.
Plaintiff, a New Jersey contracting concern, submitted a bid of $519,875.00, together with bid security of $10,397.50, for the on-site Capehart housing and was determined, when bids were opened on November 20, to be the lowest qualified bidder. Later that day the bids for the off-site work were opened. However, all bids therefore were rejected as being higher than the Government’s estimated cost, thus making readvertising necessary. The Corps of Engineers was willing to accept plaintiff’s bid for the Capehart construction, but due to the interrelated character of the two projects, was precluded from doing so until it received an acceptable off-site bid. To avoid the necessity of readvertising for the Capehart units, and in order to preserve for plaintiff his low bid position, an understanding was reached by the parties that plaintiff would send to the Corps of Engineers a letter agreeing to receive a qualified Letter of Acceptability for the Capehart work contingent upon the Government’s obtaining an acceptable bid for the off-site construction. A letter to this effect, drafted by the Corps of Engineers, was addressed by plaintiff to the District Engineer[2] on January 22, 1959, which read as follows:
*461 “It is understood by the undersigned that the New York District Office has advertised for bids for off-site work in connection with the Capehart on-site project at Grand Island, New York and contemplates opening bids toward the end of February 1959. Also, that it win not be possible to close the on-site contract unless the Department of the Army can make an award of the off-site work.
“In view of the foregoing, the undersigned is agreeable to receive a qualified letter of acceptability for the on-site work contingent upon the Department obtaining an acceptable off-site bid; and further agrees to waive any claim it may have against the Government for any costs it may incur in preparation for a closing, in the event that the letter of acceptability must be canceled because of failure to receive an acceptable off-site bid.”
On January 27, 1959, the Corps of Engineers issued to plaintiff a Letter of Acceptability stating that the contractor’s “bid dated 20 November 1958 as amended by letters 17 and 22 January 1959 in the amount of $519,800.00 [3] * * * has been determined by the Department of the Army * * * to be the lowest acceptable bid.” Other than that the Letter of Acceptability was in the standard form. It provided, among other things, that the issuance thereof obligated the plaintiff: (1) to complete organization of the mortgagor-builder corporation; (2) to “complete the necessary arrangements with a mortgage lender acceptable to the Commissioner (of FHA) as a mortgagee for financing the total cost, including (its) profit of said housing project through the execution of a mortgage and mortgage note for a period of 25 years and bearing interest at 4% per centum per annum, with the option of prepayment without penalty at the end of fifteen years;” (3) to cause the mortgagor-builder and mortgage lender to enter into a specified building loan agreement, and to cause the mortgage lender to apply to the FHA for mortgage insurance; (4) to take all steps necessary to obtain an FHA Commitment for Insurance during and after construction of the project; and (5) to execute prior to or at the time of closing the Housing Contract and all other necessary documents.
*462 Other pertinent parts of the Letter of Acceptability read as follows:
“2. Failure to perform all obligations prior to the time prescribed for closing will be just cause for cancelling all commitments undertaken with you in connection with the housing project and for the recovery under your bid security of liquidated damages in the sum of $10,397.50. The decision of the Contracting Officer shall be in writing and shall be final and conclusive unless, within 30 days from the receipt thereof, you appeal in writing to the head of the Department or his duly authorized representative, and his decision shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive. In connection with any appeal under this paragraph you will be afforded an opportunity to be heard and to offer evidence in support of your appeal.
if: * * * *
“5. You are required to be ready for the closing on or before 27 March 1959, provided that the Contracting Officer may extend the date of closing in writing upon written proof from you that the delay was caused by conditions beyond your control, and any dispute concerning such an extension will be settled in the manner provided for settling disputes under paragraph 2 hereof.”
On February 19,1959, the Corps of Engineers received an acceptable proposal for the off-site work and on the same day addressed the following letter to the plaintiff :
“Deference is made to the Letter of Acceptability dated 27 January 1959 issued to you for construction of the referenced project.
“An acceptable bid was opened today for the ‘off-site’ work; consequently, you are reminded that you will be required to be ready for a closing on 27 March 1959 as provided in the Letter of Acceptability.”
In the meantime, during the early part of February, rumors began to circulate in the financial community that the Government would increase the annual interest rate on Capehart mortgages from 4%% to 4%%. On February 17, 1959, the Assistant Secretary of Defense addressed a memorandum to the Assistant Secretaries of the Military Depart *463 ments advising them that his office had recommended to the FHA an increase in the interest rate on Capehart mortgages from 4%% to 4%%, and requesting a deferral of bid openings on all Capehart projects presently under advertisement until after March 1, or until final action was taken on the interest rate increase. The memorandum read as follows:
“After careful consideration of recent trends in the market for Capehart housing mortgages, this office has recommended to the Federal Housing Commissioner that the interest rate on Capehart mortgages be increased from 4% percent to 4y2 percent, the current statutory maximum rate.
“In view of the fact that the announcement of the increased rate will doubtless have an adverse effect on the 4% percent mortgages, it appears that every possible step must be taken to reduce to a minimum the number of projects affected by the change. Accordingly, it is requested that, effective immediately, bid openings on all projects now under advertisement be deferred until after March 1, or until final action on the interest rate increase has been taken. When the new interest rate has been announced, all outstanding advertisements should be amended to provide for financing at the new rate.
“In cases where it is necessary to defer a bid opening, no statement should be made which would relate such deferral to an interest rate increase.” [4]
On March 6,1959, the Office of the Assistant Secretary of Defense sent a second memorandum to the Assistant Service Secretaries stating:
“Reference is made to the memorandum of February 17, 1959 from this office requesting that bid openings on Capehart housing projects be deferred until an increase in the interest rate on Capehart mortgages could be effected.
“On March 2, the Federal Housing Commissioner announced that the Capehart interest rate had been increased from 414 percent to 4y2 percent. Effective March 3, 1959 the new interest rate will be applied to
*464 Capehart projects in accordance with, the following criteria:
1. Projects which were advertised and bid at 4% percent will be closed at 4% percent, as follows:
a. Letter of Acceptability issued — no exception.
b. Letter of Acceptability not issued — if hardship is clearly demonstrated and is directly attributable to the lower interest rate, all bids should be rejected and the project readvertised.
2. Projects currently under advertising (bids not opened) at 4% percent will be subject to the new rate and advertising will be amended accordingly.
3. Projects advertised subsequent to the effective date will be subject to the rate prescribed by FHA rules and regulations at the time of advertising.
“As in the past, all advertising will clearly specify that financing must be obtained from private sources.”
With respect to the Grand Island project, on March 10 the District Engineer wrote to the plaintiff to call attention to the Letter of Acceptability which required a closing on or before March 27. The District Engineer observed that the EHA had advised him, as of March 5, that it “had not received a formal application for a commitment to insure a mortgage” on the project. He, therefore, urged plaintiff to take immediate action in this regard.
Plaintiff replied on March 16 requesting a 30-day extension “in order that we may have enough elbow-room to obtain reasonable financing”. He commented that the Letter of Acceptability of January 27 “was conditioned upon obtaining by (the Corps of Engineers) of an acceptable off-site contract”; that on February 20 he “was advised that an acceptable off-site contract bid had been received, thereby removing the contingency in the Letter of Acceptability of January 27”, but that because of an increase in the permitted interest rate on Capehart mortgages from 4)4% to 4)4% and an increase in the rediscount rate by the Federal Reserve Bank, he could no longer count on financing from sources from whom he thought he had a firm commitment. Plaintiff went on to say that “(b)ecause of the factors above mentioned where the lending institution can now invest in Cape-hart mortgages yielding 4)4%, we find it to be a difficult *465 problem to work out a financing deal for a 4%% loan without exorbitant discount.” [5]
The District Engineer answered on March 19 that he was surprised that the plaintiff had not arranged a binding commitment for financing prior to the submission of a bid, and was disturbed that plaintiff had failed to give assurance that he would proceed with the project. Nevertheless, the District Engineer granted an extension for the closing to April 14,1959, but requested plaintiff to submit immediately-detailed information as to the efforts it was making to obtain financing.
Plaintiff sent a reply on March 24 stating that “(a)s of this date we have not been able to obtain any commitment other than one that would be so extremely exorbitant in its discount rate that there would be no initiative for the builder to proceed with the work as all profits would be drained off in the financing.” [6] The plaintiff added that while he was “making every possible effort to obtain financing and proceed to settlement”, he felt that “the Army should assist in this matter by granting (him) the increase in the interest rate *466 to 4¡y2%, especially in view of tlie fact that the Letter of Eligibility [sic] did not really become a firm commitment on the part of the Army until the latter part of February, at which time it was common knowledge that the interest rate on Capehart was going to be increased.” [7]
The District Engineer answered promptly that there was no authority for permitting such an increase on projects awarded prior to March 5.
On April 9 the plaintiff requested a further extension. The request was granted and the time for closing extended to April 28.
On April 22 the District Engineer wrote to the plaintiff fixing April 28 as the deadline for the contractor to obtain financing at 4%% or to obtain approval of an increase to 4^/2%. This letter read:
“I refer to my letter of 18 April 1959, subject as above, granting you an extension of time for closing to 28 April 1959, and to the numerous telephone conversations had between you and members of my staff subsequent to the date of said letter, regarding your efforts to obtain financing.
“Your inability to date to offer firm evidence of progress to obtain financing at the interest rate of 4]4% provided for in the letter of acceptability concerns me. I believe I have been liberal in granting you the extension to 28 April 1959 and you have had more than ample time to obtain the necessary financing.
“In view of the foregoing, I wish to advise you that no further time extensions will be granted unless you submit prior to 28 April 1959, either proof that you have obtained financing at the interest rate provided for in the letter of acceptability, or proof that your request for *467 an increase in the interest rate to 4*4% has been granted.”[8]
On April 30, 1959, the District Engineer telegraphed the plaintiff that his “bid security of liquidated damages in the sum of $10,397.50 is forfeited.” The telegram read:
“1. Eeference Capehart housing project, Grand Island, New York, Contract No. DA-30-075-ÉNG-8676, you as the eligible bidder on subject project, have not met the requirements of the Letter of Acceptability dated 27 January 1959, as amended by letters dated 19 March and 13 April 1959.
“2. It is my decision that pursuant to paragraph 2 of such Letter of Acceptability you have failed to perform all obligations prior to the time prescribed for closing and therefore your bid security of liquidated damages in the sum of $10,397.50 is forfeited.
“3. You may appeal this decision in writing within thirty days from the receipt hereof as provided in the aforementioned paragraph 2.”
By letter of May 8, 1959, the plaintiff appealed from this decision. A hearing on the appeal was held by the ASBCA on May 18,1960, at which time 184 pages of testimony were taken. On August 4, 1960, oral argument was presented to the board.
By a decision, rendered on July 10, 1961, the ASBCA denied the appeal.
Defendant argues here that the forfeiture of the bid security in the circumstances of the present case is proper and gives rise to no legal right for its recovery. It also argues that the decision of the ASBCA denying the appeal should be accorded finality.
Plaintiff contends, on the other hand, (1) that the qualified Letter of Acceptability did not comply with the terms of the Bid Invitation; (2) that his inability to obtain loan financing at the prescribed rate of interest was due to the defendant’s acts; (3) that the defendant is not lawfully entitled to retain his bid deposit as liquidated damages; and *468 (4) that tbe decision of the administrative board is on an issue of law and is, therefore, not final or binding on this court.
At the outset, it is clear that issuance of a Letter of Acceptability results in a contractual relationship between the parties requiring the performance by the successful bidder of certain obligations, including obtaining of financing at the specified rate of interest, so that the FILA closing will be effected within a prescribed time. To insure timely completion of these obligations, the Bid Invitation and the Letter of Acceptability impose several bid deposit requirements on the eligible builder. For one tiling the eligible builder agrees that his deposit ivill not be refunded until and unless he effects a timely closing. He also agrees that in the event he fails to effect a timely closing, “his deposit will be forfeited and become the property of the Department as liquidated damages unless the Department finds that he has made every effort to effect such closing and extends the time to effect such closing.” The validity of this provision is not in question, the principle having long since become established that in the event of default by a bidder, his bid deposit may be retained by the other party as an agreed amount for liquidated damages unless the amount is so large or disproportionate as to constitute a penalty. Sun Printing & Publishing Assn. v. Moore, 138 U.S. 642, 673-674 (1902); United States v. Bethlehem, Steel Co., 205 U.S. 105 (1907) ; Wise v. United States, 249 U.S. 361 (1919); Scott v. United States, 44 Ct. Cl. 524, 531 (1909); Hickey v. United States, 65 Ct. Cl. 729 (1928); Taylor v. United States, 138 Ct. Cl. 524 (1957). Whether liquidated damages or a penalty is involved depends on the circumstances of each case, but here, where the total cost of the contract is $519,800, it can not be said — nor does plaintiff so contend — that a bid deposit requirement of $10,397.50 is excessive or disproportionate. See Woodner v. Sankin, 188 F. Supp. 259, 261 (D.D. Col. 1961) ; aff’d 289 F. 2d 873 (D. Col. Cir. 1961).
Plaintiff does not deny that he failed to proceed as required, but he insists that the Letter of Acceptability was not valid. He says that the Bid Invitation called for a “definite, unconditional and unqualified” Letter of Accept *469 ability, whereas the defendant issued only a qualified Letter of Acceptability. According to plaintiff, “ (s) ince defendant never issued the unqualified Letter of Acceptability in conformance with the assurance in the Invitation for Bids, it did not comply with its obligations thereunder.”
This contention is not persuasive. The only difference between an unqualified Letter of Acceptability and the one actually issued to plaintiff on January 27 was the latter’s incorporation by reference of plaintiff’s letters of January 17 and January 22,1959. In his letter of January 17, plaintiff had reduced his bid by $75.00. In his letter of January 22, plaintiff had made it clear that he was “agreeable to receive a letter of acceptability for the on-site work”:
“* * * contingent upon the Department obtaining an acceptable off-site bid; and further agrees to waive any claim it may have against the Government for any costs it may incur in preparation for a closing, in the event that the Letter of Acceptability must be cancelled because of failure to receive an acceptable off-site bid.”
In short, plaintiff, as the lowest bidder, agreed to lower his bid by $75.00 and obtain a Letter of Acceptability which the Government could later cancel if an acceptable off-site bid were not received. Thus, save for a right of cancellation which expired on February 19 when an acceptable off-site bid was received, the Letter of Acceptability issued by the Government was a binding acceptance of plaintiff’s bid which imposed specifically defined obligations on both parties. On the defendant there was imposed the obligation to execute a Housing Contract with plaintiff as the eligible builder; on the plaintiff there was imposed the obligation to take specific steps necessary to effect an FHA closing.
Plaintiff states, however, that the fact that “the defendant did not either request the plaintiff to indicate its source of financing, or to give evidence of its ability to close within 60 days of the issuance of the Letter of Acceptability,” is indication that another Letter of Acceptability was to be issued later. The record, however, shows that the District Engineer had “* * * assumed that any bidder on a Capehart Housing project would have arranged for a binding commitment for financing prior to submission of a bid * * *470 Also, plaintiff’s letter of January 22, stating that the Letter of Acceptability could be canceled if an acceptable off-site bid were not received, negates any implication that the parties contemplated issuance of a later Letter of Acceptability.
Still further indication that the parties expected plaintiff to proceed with the steps necessary to closing, and in accordance with the January 27 Letter of Acceptability, was plaintiff’s waiver of closing costs. Had a further Letter of Acceptability been intended when and if the Government received an acceptable off-site bid, there would have been no occasion for plaintiff to provide in his January 22 letter for waiver of “preparation for * * * closing” costs in the event the Letter of Acceptability was canceled. It is also significant that in letters written to the defendant on March 16 and March 24, 1959, plaintiff gave every indication that he had received a valid Letter of Acceptability; that he was required to obtain mortgage financing at 4%%; and that all he requested was a time extension for the closing. And there is the further consideration that at no time did plaintiff protest the wording of the Letter of Acceptability.
The conclusion is thus evident that plaintiff by his bid and his letters of January 17 and January 22, 1959, agreed to accept exactly the Letter of Acceptability he obtained and that there was no deviation between bid and acceptance.
Beyond this, plaintiff claims that the sole reason for his failure to close and proceed with the project was his inability to obtain financing at the prescribed 4*4% rate of interest. This statement is correct only to the extent that it must be accepted for purpose of this motion that plaintiff was unable to obtain such financing so long as the Government had the right to cancel the Letter of Acceptability.[9] This impediment was removed, however, on February 19 when an acceptable off-site bid was received. After that the plaintiff was admittedly able to obtain mortgage financing at 4%%, provided he was willing to pay what he has characterized as an “exorbitant discount”. However, this “exorbitant discount”, as detailed previously, could not have been more than $13,179.33 of the $5.19,800 bid.[10] The important considera *471 tion is that 4*4% financing was available albeit at a greater discount than plaintiff apparently wished to pay.
It could well be that this increased discount expense was due to the then state of the market and anticipated changes in the Government’s market rate. But these factors are immaterial since market fluctuations affecting the cost of financing are risks the bidder must assume just as he assumes the risk of higher labor and material costs.
What is more, it may be assumed arguendo that plaintiff’s cost of financing had, in fact, increased by $13,179.33 in the period between his bid and the closing date. Even so, this would not be valid justification to excuse the default. For it is settled that performance of a contract is not excused by unusual or unanticipated expense. Industrial Engineering Co. v. United States, 92 Ct. Cl. 54, 60 (1940); Whitlock Corp. v. United States, 141 Ct. Cl. 758, 763-764 (1958); Wickham Co. v. Minnesota Co. 7 F. 2d 873, 875 (7th Cir. 1925); Farmer's Fertilizer Co. v. Lillie, 18 F. 2d 197 (6th Cir. 1927); Megan v. Updike Grain Corp., 94 F. 2d 551, 554 (8th Cir. 1938). This is true notwithstanding that the increased expense arises from “an abnormal rise in the price of goods * * * or unusual trade conditions” which could not be readily foreseen. Farmer's Fertilizer Co. v. Lillie, supra, at p. 199. “(I)f a party by his contract charges himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him.” Dermott v. Jones, 69 U.S. 1, 7 (1864).
Plaintiff argues further that “the act of the Department of Defense in increasing the interest rate on Capehart mortgages did not constitute a sovereign act, but was an interference with plaintiff’s performance of the obligation it had assumed to procure a 25-year mortgage at an interest rate of 4%%, and was a breach by the Government of the implied condition to every contract that neither party will act to increase the other party’s cost of performance.” The short answer to this contention is that it is inconceivable that the contracting officer on the Capehart project would have agreed, expressly or impliedly, that the FHA or any other *472 Government agency would, regardless of the national need therefor, abstain from increasing interest rates on Cape-hart work generally during performance of the contract in question. The contracting officer could not thus circumscribe the exercise of such governmental power. See Bateson-Stolte, Inc. v. United States, 158 Ct. Cl. 455, 460, 305 F. 2d 386, 389 (1962).
More particularly, “the United States when sued as a contractor can not be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.” Horowitz v. United States, 267 U.S. 458, 461 (1925); Deming v. United States, 1 Ct. Cl. 190 (1865); Wilson v. United States, 11 Ct. Cl. 513 (1875); Gothwaite v. United States, 102 Ct. Cl. 400 (1944); Standard Accident Ins. Co. v. United States, 103 Ct. Cl. 607 (1945); cert. den. 326 U.S. 729. In Horowitz the Supreme Court quoted with approval what this court said in Jones v. United States, 1 Ct. Cl. 383, 384-385 (1864) :
“. . . The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons ... In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.”
The action by the Government raising interest rates was not directed specifically at plaintiff’s contract performance and, in fact, was not applicable to it. On the contrary, it was a “public and general” act for the “general good” issued in the exercise of the sovereign power of the United States for which the Government, therefore, was not liable as a contractor. Hallman v. United States, 107 Ct. Cl. 555, 556 (1946); Piggly Wiggly Corp. v. United States, 112 Ct. Cl. *473 391, 420 (1949); J. B. McCrary Co. v. United States, 114 Ct. Cl. 12 (1949); Peerless Casualty Co. v. Weymouth Gardens, 215 F. 2d 362 (1st Cir. 1954).
Plaintiff also asserts that the defendant is not lawfully entitled to retain his bid deposit. To support this contention, he states that the Bid Invitation “provided that the award of the work would be made within 60 days and that bid deposits of the unsuccessful bidders would be refunded not later than 60 days after the opening of the bids, which took place on November 20, 1958 . . For this reason it is his position that the letter of January 22 was submitted 62 days after the bid opening and consequently the “only legal obligation which then existed between the parties was the obligation assumed by the defendant under the terms of the Invitation to return bid deposits within 60 days from November 20, 1958.”
There are several difficulties with this argument. In the first place, the Bid Invitation does not contain any provision that the work must be awarded within 60 days from the bid opening. Paragraph 1(b) of the Invitation provides that “(w)hen bids are received and after consultation with the (FHA) . . . the Department determines the person . . . who has submitted the lowest acceptable bid.” Paragraph 1(c) provides that the Department issues to the lowest acceptable bidder a Letter of Acceptability. No provision is made for the time within which the Letter must be issued. Paragraph 8 of the Invitation provides only that “. . . (t)he deposits of unsuccessful bidders will be returned to them not later than 60 days after the opening of the bids.” The bid plaintiff submitted contained no limitation on the time within which the Department could issue a Letter of Acceptability in response to it if it were determined to be the lowest acceptable bid. Further, paragraph 8 of the Invitation states that the purpose of the bid deposit is “. . . to insure that if he is the lowest acceptable bidder he will effect a closing with FHA within the time prescribed in the Letter of Acceptability.” Paragraph 2 of the Letter of Acceptability provides that the bid deposit is forfeited if the obligations prerequisite to a closing are not performed by the lowest acceptable bidder.
*474 Thus, the plaintiff by submitting the lowest acceptable bid could only obtain refund of his bid deposit by effecting a timely closing. As paragraph 8 of the Bid Invitation states: “. . . if the lowest acceptable bidder effects a timely closing with the FHA. the amount of his deposit will be refunded to him at the closing with the FHA.”
Plaintiff is incorrect when he states that at the date he agreed to have a Letter of Acceptability issued containing a limited right of cancellation by the Government the only legal right which existed between the parties was the defendant’s obligation to return the bid deposit. On the contrary, plaintiff’s bid was still open. Even if plaintiff had a right to do so, he made no attempt to withdraw it. See Scott v. United States, 44 Ct. Cl. 524 (1909). Defendant had no time limit within which to accept the bid. Further, plaintiff by his letters dated January 17 and 22, 1959, made it plain his offer was still open.
The action of defendant in accepting plaintiff’s offer by issuing a Letter of Acceptability on January 27, 1959, was procedurally correct. Leitman v. United States, 104 Ct. Cl. 324, 341 (1945). Plaintiff then became obligated to effect a prompt closing or in the alternative lose his bid deposit.
Additionally, plaintiff argues that the decision of the board was on an issue of law and thus is not final and binding here. This argument can not be accepted. The finding of the contracting officer, which- was affirmed by the ASBCA, was that the plaintiff had “failed to perform all obligations prior to the time of closing”. This was a finding of fact. Indeed this court on several prior occasions has held in similar circumstances that whether a default is excusable is clearly a question of fact. Holpuch v. United States, 102 Ct. Cl. 795, 803 (1945); Whitlock Corp. v. United States, 141 Ct. Cl. 758 (1958). The decision of the ASBCA was therefore final and conclusive on the parties absent a showing that it was arbitrary, capricious, fraudulent, or not based on substantial evidence. See e.g. Valentine and Littleton v. United States, 136 Ct. Cl. 638 (1956).[11] *475 Plaintiff has made no such showing here. P.L.S. Coat & Suit Corp. v. United States, 148 Ct. Cl. 296, 302 (1960); National Electronic Lab., Inc. v. United States, 148 Ct. Cl. 308 (1960); Keco Industries, Inc. v. United States, 157 Ct. Cl. 691 (1962). In fact, plaintiff has not even made the requisite showing of a genuine issue of material fact necessary to preclude granting of summary judgment. See Holcomb v. United States, 135 Ct. Cl. 612 (1956); Curtis v. United States, 144 Ct. Cl. 194, 199 (1959) cert. denied, 361 U.S. 843.
Even if the board decision were assumed to be on a question of law rather than fact, and therefore not final, this would avail plaintiff nothing. Independent of the board decision, the motion for summary judgment is ripe for determination on the legal issues since the material facts are not in dispute. As a matter of law, it is apparent that defendant is entitled to retain plaintiff’s deposit for bid security as liquidated damages for unjustified default of his contract obligations.

 42 use §§ 1594 — 1594(1) ; 12 USC §§ 1748-1748g.

 The District Engineer was the contracting officer for the defendant.

 On January 17, 1859, plaintiff had addressed a letter to the Corps of Engineers voluntarily reducing his bid by $75.00.

 This memorandum was, of course, not applicable to the Grand Island project by reason of the fact that bids on that construction had been advertised on October 20, 1958, almost four months before the date of the memorandum, and the bid opening had taken place on November 20, 1958, almost three months before. Nor was the oil-site construction affected since it was not a Capehart project.

 The discount mentioned by plaintiff has reference to the industry practice of negotiating “points”, as well as setting an interest rate. For example, if a borrower seeks a 10-year loan of $100,000 at 5 % interest, the lending institution may make the loan at par, which is to say that no points are charged; it may pay a premium for the loan ; or it may charge the borrower a prescribed number of points depending upon the state of the money market. Each point is equivalent to 1%. Assuming that the borrower is charged S points, this means that he has to pay the lending institution for the loan 3% of its face amount, or $3,000, plus the stipulated 5% rate of interest. In industry terminology, the transaction would be described as a 5% loan at a discount of 3 points. In these circumstances, it is evident that the discount which a Capehart builder would have to pay to obtain financing at a prescribed rate of interest would be affected by the interest rate the lending institution could obtain for similar investment opportunities. Thus, if the money market became tight and comparable investments could be had at a 4% % interest rate, the Capehart builder, in order to obtain financing at a 4% % rate, would have to pay an appropriate equalizing discount to the lending institution.

 Defendant has filed in support of the motion an affidavit executed by an Assistant Commissioner of the EHA which states that “the amount necessary to compensate a mortgagee for the difference in interest rate between 4% % and 4%% on (a) loan (of $519,800, the amount of plaintiff's bid) is $13,179.33.” On the basis of this affidavit which is uncontradicted, the “exorbitant” discount to which plaintiff refers could not have exceeded $13,179.33. Defendant has also filed a statement signed by an official of the PHA certifying that during the period March 2 to April 30, 1959, the PHA Commissioner “would have interposed no objection to an eligible builder’s paying a mortgagee a discount in an amount necessary to compensate for the difference between 4%% interest and 4% % interest on a mortgage insured under Section 803 of the National Housing Act.”

 Plaintiff contends Rere — as he did before the Armed Services Board of Contract Appeals (ASBCA) — that he ivas unable to obtain a firm commitment for 4%% financing during the period from January 27 to February 19, 1959, when the Letter of Accepability was contingent upon the receipt of an acceptable off-site bid. Plaintiff says this was due to the fact that lending institutions were unwilling to give financing assurance on the strength of a qualified Letter of Acceptability. The ASBCA found to the contrary that 4% % money w>as actuaUy offered to the plaintiff during the period in question. However, for purpose of the motion, all factual inferences favorable to the plaintiff on disputed questions of fact must be accepted as correct. Thus, it is assumed here that until the contingency in the Letter of Acceptability was removed on February 19, plaintiff was unable to obtain a firm financing commitment at a 4% % rate of interest.

 In the early part of April, the plaintiff requested the Defense Department to increase the project’s interest rate to 4% %. That Department notified him on April 21 that the Department of the Army, as the contracting agency, had responsibility for determining whether an increase in the interest ratei was justified and that his letter was therefore being referred to it.

 See footnote 7, supra.

 See footnotes 5 and 6, supra.

 Without merit is plaintiff’s contention that the ASBCA decision is invalid because the member who heard the evidence did not decide the case. There is no applicable rule stating that the board decision must be rendered by the individual who presided at the hearing. See Racine Screw Co. v. United States, 156 Ct. Cl. 256, 258 (1962).