**D & L CONSTRUCTION CO. & ASSOCIATES**

v.

**The UNITED STATES.**

**No. 281-65.**

United States Court of Claims.

June 9, 1967.

See also Ct.Cl., 378 F.2d 680.

Joel C. Wise, Washington, D. C., for plaintiff. W. E. Fitzpatrick, Los Angeles, Cal., attorney of record; Fitzpatrick & Lewi, Los Angeles, Cal., of counsel.

J. Michael Gottesman, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant. Katherine H. Johnson, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

The plaintiff, D & L Construction Co. & Associates,[1] brings this suit to recover its bid deposit in the amount of $25,000, and its Federal Housing Administration (hereinafter referred to as "FHA") application fee totaling $12,750.50, paid in connection with a Capehart housing project which called for the construction of 500 units of housing for the Department of the Navy. Plaintiff also seeks an additional $90,000 allegedly incurred for attorneys' fees and overhead in maintaining an office near the job site to prepare for performance of the contract.

It is the plaintiff's contention that it was prevented by acts of the defendant from obtaining financing necessary to perform its contractual obligations which resulted in the cancellation of its Letter of Acceptability.[2] The defendant maintains, in its motion for summary judgment, that plaintiff's default in failing to close on or before the designated closing date, as modified, was due to the admitted fact that plaintiff was unable to obtain financing to go ahead with the project.

We will now set forth the facts around which this controversy revolves.

On March 31, 1959, the plaintiff, in response to an Invitation for Bids styled No. NBy(CH) 21263, issued by the defendant, acting through the Department of the Navy, submitted its bid, which included additive items 1 through 5, in the total sum of $8,117,000, for the construction of 500 units of housing in the vicinity of the United States Naval Submarine Base, New London, Connecticut.[3] The Invitation for Bids required that the plaintiff submit a bid price for the construction of the 500 unit project showing such price segregated into three categories of work. One was termed the "basic bid", another as "additive items," and a third as "deductive." It was provided that the relative order of bidders would be determined by adding to the price computed for the "basic bid," the amounts bid for "additive items" until a total sum equal to the statutory maximum of $16,500 per unit of housing was reached. In accordance with the further requirement of the Invitation, the plaintiff deposited with the defendant the sum of $25,000, to insure that if it was selected as the lowest acceptable bidder, it would perform the necessary preliminary steps and effect a timely closing with the FHA.

The relevant provision of the Invitation for Bids, Part II, paragraph 8, reads as follows:

Each bidder is required to submit with his bid a certified check in the amount specified in paragraph 3 of Part I of this Invitation [$25,000.00], payable to the Treasurer of the United States, to insure that if he is the lowest acceptable bidder he will perform the necessary preliminary steps and effect a closing with FHA within the time prescribed in the Letter of Acceptability, including the furnishing of an acceptable performance and payment bond. *In the event the lowest acceptable bidder fails to effect a closing with FHA within the time prescribed, his deposit will be forfeited and become the property of the Government as liquidated unless the Department finds that he has made every effort to effect such closing and extends the time to effect such closing. If the lowest acceptable bidder effects a timely closing with the FHA, the amount of his deposit will be*

---

1. D & L Construction Co. & Associates, is a joint venture consisting of: D & L Construction Co., a California corporation, Louis Lesser Enterprises, Ltd., a limited partnership formed pursuant to the laws of California; and Lesser Industrial Properties, Ltd., a limited partnership formed pursuant to the laws of California.

2. See generally, Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L. Ed.2d 111 (1963), for a description of the procedures concerning a Capehart project.

3. This bid was within the statutory limit of $16,500 per unit [$8,250,000].

*refunded to him at the closing with FHA.* The deposits of unsuccessful bidders will be returned to them not later than 60 days after the opening of the bids. Each prospective bidder is advised that the failure to submit such certified check with his bid will render his bid defective and will be cause for its rejection. [Emphasis supplied].

The plaintiff's bid was subsequently determined to be the lowest acceptable bid and on April 14, 1959, the defendant issued an initial "Letter of Acceptability" which advised the plaintiff that it was obligated to perform certain acts. These included: (1) forming certain mortgagor-builder corporations; (2) obtaining title insurance or other evidence of title; (3) arranging for financing the construction of the units; (4) furnishing a commitment for mortgage insurance to be issued by the FHA; (5) acknowledging receipt of such writing; and (6) estimating the time necessary to accomplish the acts referred to previously. The closing date designated in *this initial* Letter of Acceptability, by which all of such acts were to be completed, was on or before May 27, 1959. The Letter of Acceptability provided for the increase or decrease of the plaintiff's bid to reflect any increase or decrease in prevailing wage rates between the time of the bid and the commencement of construction. Determination of such increase or decrease would be made by the Commissioner of the Federal Housing Administration.

While the exact date is in some dispute not considered material in this litigation, the plaintiff alleges that on or about April 12, 1959 (which would be two days prior to the issuance of the Letter of Acceptability), it made application to the defendant, acting through the FHA, for mortgage insurance to insure the financing of the construction of the project. The plaintiff paid to the defendant the sum of $12,750.50, which represented the required fee for filing such application.

The applicable regulations provide as follows:

(a) No application will be considered unless the fee therefor has been paid. This fee, referred to as the application fee, is $1.50 per thousand of the face amount of the loan applied for.

(b) If an application is rejected before it is assigned for processing by the [FHA] Commissioner, or *in such other instances as the [FHA] Commissioner may determine, the entire fee or any portion thereof may be returned to the applicant.* [Emphasis supplied.] 24 C.F.R. § 292a.3 (Supp. 1961)

The closing date stipulated in the original Letter of Acceptability was extended upon request by the plaintiff a total of eight times—from May 27, 1959, until finally October 9, 1959. These extensions gave rise to the issuance of two modified Letters of Acceptability, first in August 1959, and again on September 10, 1959. The circumstances surrounding the issuance of these modifications will be fully explained below. The FHA issued its Commitment for Insurance on June 30, 1959.

As mentioned previously, the plaintiff's bid included additive items 1 through 5. However, on August 11, 1959, the plaintiff advised the defendant that it would accept an amendment to the Letter of Acceptability to provide that the scope of the work would include as additives only Additive #1 (officers' carports) for a total contract price for the 500 basic units and such additive, of $8,200,000. In this proposal of August 11, 1959, plaintiff stated that it would waive any adjustment for labor increases in excess of that amount.

Notwithstanding the fact that the defendant on August 12, 1959, accepted the plaintiff's proposal and forwarded a Modified Letter of Acceptability pursuant to it, the plaintiff did not sign the letter and in lieu thereof wrote the defendant on August 22, 1959, that it:

* * * will proceed to complete the initial closing of the above-described project providing that the full labor increase of $276,569 be added to the bid price, making a total contract price of $8,221,569 and that all additives be eliminated. It is our understanding

that this will leave $28,431.00 for construction changes.

This August 22, 1959, proposal of the plaintiff was accepted by the defendant which forwarded to the plaintiff a (second) Modified Letter of Acceptability dated September 10, 1959. All additives were eliminated, the bid price was fixed at $8,221,569, and the closing date was again extended to September 25, 1959. Presumably, these proposals were suggested by the plaintiff pursuant to its assumption that all additives would be eliminated from the scope of work should the adjustment for increase in wages when added to the basic bid approximately equal or exceed the statutory limit of $16,500 per unit.

The September 11, 1959, communication from the defendant to the plaintiff in which the aforementioned (second) Modified Letter of Acceptability was enclosed, read as follows:

On the basis of your intention to effect the initial closing on or before September 25, 1959 as indicated in your letter of September 4, 1959, your proposal made orally at the Bureau of Yards and Docks on August 21, 1959, and confirmed by your letter of August 22, 1959, is accepted.

A Modified Letter of Acceptability is enclosed.

On September 25, 1959, the plaintiff, by telegram, requested a further extension of the closing date and by letter dated September 28, 1959, the closing date was extended to October 9, 1959. The plaintiff was notified under date of September 30, 1959, in pertinent part as follows:

\*     \*     \*     \*     \*     \*

The closing date stipulated in the original Letter of Acceptability was May 27, 1959. This date was extended as follows:

| | |
|---|---|
| June 25, 1959 | August 20, 1959 |
| July 30, 1959 | August 30, 1959 |
| August 13, 1959 | September 5, 1959 |
| | September 25, 1959 |

No reason was stated in your last [September 25, 1959] request for extension but, it was generally understood that this last extension and several preceding ones were requested to allow you to complete negotiations for financing the project.

In view of the fact that every possible consideration has been given to accommodate you in effecting a closing over an extended period of time, you are advised that no further extension will be granted beyond October 9, 1959.

You are notified that in the event you will not be in a position to close on that date, the Department of the Navy will exercise the provisions of Paragraph 8 of Part II of the Invitation for Bids and your deposit of $25,000 made to insure performance by you will be forfeited.

\*     \*     \*     \*     \*     \*

The plaintiff became in default on October 9, 1959. On October 13, 1959, the plaintiff's counsel telephoned counsel for the defendant's contracting officer and admitted the inability of his client (the plaintiff) to obtain the necessary financing. The explanation for such failure is said to have been the "defendant's refusal to settle the issue as to whether additives were to remain as part of the scope of work to be performed after the addition of labor escalation, over a long period of time during which the cost of financing was rapidly increasing." The (second) Modified Letter of Acceptability was then withdrawn and cancelled.

On February 20, 1960, the plaintiff, by its president, wrote the defendant requesting return of its bid deposit of $25,000 made March 31, 1959, asserting that "performance of the undertakings by us in the bid was rendered impossible by forces beyond our control."

The defendant advised the plaintiff on March 29, 1960, that the bid deposit had been forfeited in accordance with paragraph 8 of the Invitation for Bids. This lawsuit ensued.

In its petition the plaintiff contends that the defendant erroneously interpreted the scope of the work as including all six additives under any circumstances.

In fact, the plaintiff identifies the *sole* cause of its inability to meet the closing date as the defendant's refusal to compromise with respect to the elimination of the additives from the scope of work. The delay in giving ground on this issue is alleged to have effectively prevented the plaintiff from fully performing the requirements of the Letter of Acceptability at a cost which would have made the construction of the project economically possible.

■ There is no merit to the plaintiff's explanation of its default as having been caused by the defendant's unwillingness to settle the additive issue. There are several factors which amply justify the conclusion that the defendant was at all times cooperative and amenable to the plaintiff's proposals, as well as to its interpretation of the Invitation for Bids as providing that in the event the labor increase, when added to the basic bid resulted in a contract amount so near the statutory limit that there was an insufficient amount left within the statutory limit to pay for the additive items, they would be eliminated.

In its answer to the defendant's request for admissions, the plaintiff admits that the defendant acceded to its suggestion of August 11, 1959, that the Letter of Acceptability be modified to include only Additive #1. Furthermore, the plaintiff, in effect, withdrew that proposal on August 22, 1959, when it advanced the proposition that the Letter be further modified so as to eliminate *all* additives. In this instance also, as the plaintiff admits, the defendant without any showing of undue delay, accepted the plaintiff's proposal. As will be recalled, the closing dates were extended somewhat beyond the dates of these proposals.

Certainly if the plaintiff's contention that the defendant erroneously interpreted the scope of the work as including all six additives is anything but an afterthought, the plaintiff would not have continuously requested extensions of time and made proposals, but would have commenced suit. There is no allegation of economic duress or of any other fact which would support a finding that these requests for extensions and proposals were involuntarily made. In addition, if the contract unalterably called for inclusion of the additives in any event, it is safe to make the statement that the defendant would not have willingly excluded the additives without a corresponding downward adjustment in the contract price. The fact is that the defendant eliminated all additives and increased the total contract price from that originally bid unhesitatingly. But the plaintiff maintains that in August 1959, the cost of financing had increased to a point where it was not economically feasible to build the project with even the one additive proposed; and on September 10, 1959, at the time the Letter of Acceptability was modified the second time to eliminate all additives, the cost of mortgage money had increased to a point where it was not feasible to construct the project even in the absence of all additives. Thus, the plaintiff concludes that had the defendant issued its final determination as to wage adjustment and made the decision to eliminate all additives within the period provided in the Invitation for Bids and the Letter of Acceptability, the project would have been feasible. The inference must be drawn, however, that these proposals were made in good faith, that is, that the plaintiff had arranged for obtaining financing that was "feasible" at the time and within the terms of its various proposals. It cannot seek now to support its case by alleged circumstances that it voluntarily removed from consideration by engaging in the subsequent modifications and amendments we have already discussed above.

■ The plaintiff fails to realize that it, as a competent contracting party, had the capacity to and did in fact agree eight times with the defendant to amend their contract by extending the closing date. The plaintiff also initiated the issuance of the two modified Letters of Acceptability. This removed any obligation whatsoever on the part of the defendant to issue its insurance commit-

ment and make the decision to eliminate all additives by the initial closing date of May 27, 1959, even assuming there was such an obligation at the outset.

The plaintiff, in effect, seeks to ignore its requests for extensions of time to secure the necessary financing and strides to collar the defendant with the blame for its failure to obtain such financing. The defendant, indeed, was abiding by its contractual obligation to make increments in the bid price when the facts so dictated and the plaintiff attempts to convert this compliance with the contractual provisions into a claim for breach of warranty—that is, prevention and hindrance of the plaintiff's performance by the defendant.

■ The plaintiff cannot be successful in its maneuver to charge the defendant for the fluctuation of market prices in light of the mutual amendments to the contract made by the parties extending the closing date until October 9, 1959, and in light of the pronouncement in Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 471 (1963), cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111, that "market fluctuations affecting the cost of financing are risks the bidder must assume just as he assumes the risk of higher labor and material costs." Accord, Terminal Constr. Corp. v. United States, 171 Ct.Cl. 1, 4–5 (1965).

As we have determined that the defendant was not responsible for the plaintiff's default, we see no basis to deviate from the very plain language contained in the Invitation for Bids which compels a forfeiture of the bid deposit in circumstances such as these. Moreover, in this case, the plaintiff was expressly informed on September 30, 1959, by written notice, that if it was not in a position to close on October 9, 1959, the Department of the Navy would invoke paragraph 8 of Part II of the Invitation for Bids, supra, and its $25,000 bid deposit would be forfeited.

■ As to the claim for return of the FHA application fee in the amount of $12,750.50, the regulations vest discretion in the FHA to retain the application fee and the plaintiff has not made any showing that such discretion has been abused. Terminal Constr. Corp. v. United States, supra, at 9.

■ In like vein, the claim for attorneys' fees and overhead must fail since the defendant is not to be made to bear the incidental expenses incurred by the lowest bidder when it fails, as here, to perform because of financial problems.

Accordingly, defendant's motion for summary judgment is granted and the plaintiff's petition is dismissed.