ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| Powertronic Systems Florida, Inc. ) | ASBCA No. 62174 |
| ) | |
| Under Contract No. N00253-18-C-0003 ) | |

APPEARANCES FOR THE APPELLANT: David L. Hayden, Esq.
Jackson W. Moore Jr., Esq.
  Smith, Anderson, Blount, Dorsett, Mitchell
    & Jernigan, LLP
  Raleigh, NC

APPEARANCES FOR THE GOVERNMENT: Craig D. Jensen, Esq.
  Navy Chief Trial Attorney
Trenton Bowen, Esq.
  Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE CLARKE

This appeal involves a termination for default of a Navy small business contract for certain pressure switches. The termination was based on Powertronic's failure to make progress to complete First Article (FA) testing. After the parties entered into a modification reestablishing the FA schedule, Powertronic again failed to make progress on the FA testing and was terminated for default. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties agreed to submit this appeal on the record, pursuant to Board Rule 11. After considering Powertronic's excuses for its failure to make progress, we conclude that the Navy was justified in terminating the contract. The appeal is denied.

FINDINGS OF FACT

1. On August 9, 2017, the Naval Undersea Warfare Center (NUWC) Keyport, WA issued a Request for Proposals, Solicitation No. N00253-17-R-0005, seeking offers to manufacture Oil-Filled Pressure Switches (R4, tab 1 at 1-2). The contract was rated DO-C9 (*id.* at 1). The switches were to be manufactured in accordance with drawing 6277300 Revision H and Weapon Specification (WS) 22017 Rev. H, and all associated drawings and specifications (*id.* at 2). The solicitation envisioned that a portion of the requirement "may support Foreign Military Sales (FMS)" (*id.*).

2. The solicitation incorporated by reference Federal Acquisition Regulation (FAR) 52.249-8, DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) (APR 1984), that reads in part:

> (a) (1) The Government may, subject to paragraphs (c) and (d) of this clause, by written notice of default to the Contractor, terminate this contract in whole or in part if the Contractor fails to-
>
> (i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;
>
> (ii) Make progress, so as to endanger performance of this contract (but see paragraph (a)(2) of this clause); or
>
> (iii) Perform any of the other provisions of this contract (but see paragraph (a)(2) of this clause).
>
> (2) The Government's right to terminate this contract under subdivisions (a)(1)(ii) and (1)(iii) of this clause, may be exercised if the Contractor does not cure such failure within 10 days (or more if authorized in writing by the Contracting Officer) after receipt of the notice from the Contracting Officer specifying the failure.

(R4, tab 1 at 42)

3. The contract was to be a 100% set-aside for small business pursuant to FAR 52.219-6 (R4, tab 1 at 41; app. br. at 4 ¶ 2). Powertronic was at all relevant times a certified HUBZone small business contractor (app. br. at 4 ¶ 1).

4. The solicitation included a requirement for 20 FA or Preproduction Samples, to be subjected to testing completed and approved within 300 days of award. The production quantity of 250 was to be completed within 300 days of FA approval. A sample lot of four was to be selected from the production lot for testing. Delivery of the remaining 246 production switches was to be within 15 days of approval of the sample lot. (R4, tab 1 at 2-4, 15, 28) The solicitation included various options (*id.* at 5-12).

5. The solicitation specified that the FA Samples "shall be manufactured, inspected, and delivered using the productions machines, methods and procedures proposed in the Contractor's Technical Proposal" and tested by Powertronic (R4, tab 1

2

at 15).  In its proposal, Powertronic represented that it had previously manufactured the Oil-Filled Pressure Switches:

> PSFI has already successfully manufactured and conformance tested PN 6277300H IAW with all associated drawings, specifications and revisions of solicitation's N00253-17-R-0005 TDP.

(R4, tab 13 at 0024)

6.  However, in his deposition, Powertronic's CEO, Mr. Durost, testified that Powertronic had not actually conducted the 75g 50 ms shock test required in WS 22017, Paragraph 4.6.3.4, in its prior manufacturing, instead performing what it deemed an "equivalent" even though its procedures did not meet "the fine requirements of tolerance" of the required test (gov't mot. to supp. record, ex. 4, depo. of J. Durost, at 13-15).

7.  Solicitation Modification No. 0004, dated September 20, 2017, included answers to vendor's questions including the following about Government Furnished Equipment (GFE):

> Answer 6:  7265900 is the whole pump assembly.  We are providing the awarded vendor with the Pump body 1568917 as Government Furnished Equipment (GFE) for mounting purposes.  The drawing 7265900 should not be required for pricing or technical proposals, therefore will not be provided.

(R4, tab 5 at 1-2)

8.  On February 2, 2018, contracting officer (CO) Melanie Powers issued the award to Powertronic for the manufacture of the switches (R4, tab 15 at 1).  Within thirty days after award (which would be March 4, 2018), Powertronic was to provide its test and inspection plan for FAs and production lots (R4, tab 19 at 1).  Based on the date of award and 300 day FA schedule, the FAs were due to be completed and tested by November 29, 2018.

9.  On March 29, 2018, the parties held a post award conference (R4, tab 22).  During the conference, the Navy noted that the Inspection Plan, due March 4, 2018, was overdue (*id.* at 2).

10.  On April 3, 2018, Powertronic submitted a "Post Award Response" providing additional information about itself and asking some technical questions (R4, tab 23).  In that Post Award Response, Powertronic again represented that it had previously built a

3

unit that passed the conformance testing of WS 22017 but due to other factors Powertronic could not complete the contract (*id.* at 3).

11. On May 1, 2018, Powertronic sent Anita Moosmiller, NAVSEA Contract Specialist, an email as follows:

> We are rapidly approaching deadlines to meet the first article shipment date and we have yet to hear any details relating to the GFE as well as a response to the technical questions submitted after the post award orientation.
>
> Is there any status updates on this?

(R4, tab 24 at 1)  On May 8, 2018, the Navy provided answers to Powertronic's technical questions, but did not mention the GFE.  The Navy did inquire about the inspection plan that was due March 4, 2018, but had not been received.  (R4, tab 25)

12. In an email on July 30, 2018, Ms. Moosmiller asked Powertronic to provide an update on its status toward completion of the contract (R4, tab 26 at 4).  She advised Powertronic that it still had not submitted its inspection plan due in March, and asked that the parties schedule a conference (*id.*).  Powertronic responded that it was "swamped" with actions on other contracts, that it had undertaken a redesign of the switch[1], and that a supplier was not conforming to regulations (*id.*).

13. On August 7, 2018, Navy and Powertronic held a conference call (R4, tabs 27-28).  At that time, Powertronic still had not submitted the inspection plan and stated that it would try to do so by August 10, 2018 (R4, tab 28 at 1).  During the call, the Navy asked that Powertronic provide a project schedule that would show the status to meet the 300-day delivery date for the FA test results (*id.* at 2).  Powertronic stated it would try to provide such a schedule by August 10.  Minutes indicate that the GFE had been delivered to Powertronic but did not identify the date of delivery (*id.* at 1).

14. On August 10, 2018, Powertronic provided its inspection plan (R4, tab 29 at 3, tab 30).  Powertronic did not provide a project schedule.  On August 21, 2018, CO Powers again requested the schedule, expressing concern that Powertronic would not meet the contract schedule (R4, tab 29 at 2).  Powertronic provided a schedule that day (*id.* at 1-2).  Powertronic's schedule indicates that 30 FA units were being produced with 2% completion and FA testing was 0% complete (R4, tab 31 at 1-2).

---

[1] This comment makes no sense.  This is a design specification contract (finding 1) and a contractor has no right to "redesign" the switch outside of formal Engineering Change procedures.

15. On October 12, 2018, Powertronic submitted a second revised FA schedule and a Request for Variance (RFV) (R4, tabs 38-39). The RFV asked that Powertronic be allowed to "accelerate" the 90-day storage life test (R4, tab 39 at 1). The schedule showed a FA Testing percent completion of 0% across the board (R4, tab 38 at 1). It allowed 64.5 days for the 90-day storage test, and reflected shipping of the FAs to occur on March 4, 2019 (*id.* at 3).

16. On October 17, 2018, the parties held a conference call (R4, tab 42). During that call, CO Powers expressed significant concern that Powertronic was unable to adhere to, or provide an accurate, schedule (*id.* at 1). The memorandum of the call included comments on the 0% completion indicated on the latest schedule:

> The contracting officer notes that the steps are not in order. PSFI states some items are complete. The main issue is that the Government is unable to rely on any schedule that PSFI has provided, in order to accurately determine any stages of completion. The steps are out of order, and the schedule remains inaccurate, not current, and incomplete.
>
> PSFI states the Quality Assurance Plan (QAP) was submitted with the proposal. The Government agrees, but the schedule shows 0% complete.

(R4, tab 42 at 2) CO Powers noted that trying to correct the schedule for the inaccuracies, it appeared delivery of the FAs might occur in April or May 2019, which was a significant delay and raised concern about Powertronic's ability to complete the contract (*id.* at 1).

17. On October 18, 2018, Powertronic submitted a third revised schedule that added the production lot schedule (R4, tabs 43-44). The schedule indicated that FA testing was 0% complete but that the FA testing "Finish Date" was March 20, 2019 (R4, tab 44 at 1). The schedule indicated the FA would be "shipped" on March 27, 2019. Powertronic notified the Navy that it would purchase parts for the production lot at risk while FA testing proceeded. (*Id.* at 3)

18. On October 30, 2018, Ms. Moosmiller requested an update as to whether the testing locations were the same and the dates were holding (R4, tab 47 at 1).

19. On November 1, 2018, Powertronic notified the Navy of additional technical issues with the FAs (R4, tab 50). Specifically, Powertronic notified that some of the units did not have a proper vacuum, and that there was a global shortage of Viton (a material chosen for a rubber diaphragm) and so Powertronic was exploring an alternate material (*id.* at 3). Powertronic predicted a schedule slip of less than a week for the vacuum issue,

5

and did not address schedule impacts of the diaphragm material (*id.*). Powertronic reported additional FA delay associated with a "snap action washer" and "PSI" problems (R4, tab 51).

20. On November 13, 2018, Powertronic submitted its 4th revised schedule, which reflected 0% FA testing completion and a FA inspection "finish" date of April 22, 2019 (R4, tab 51 at 1, tab 52 at 1).

21. On December 4, 2018, the Navy issued a denial of Powertronic's October 12, 2018 RFV to the storage life test citing no real benefit and the possibility of damage to the units (R4, tab 57 at 1). On December 6, 2018, Powertronic advised that it had completed production of the FAs but was delayed by another contract:

> First articles have been produced. We have been overloaded by contract SPE4A618PN701 which is under a critical supply position. A supplier (QPL) gave us switches that failed a lot test thus requiring 100% screening which has fully loaded our chamber/vibration table.

(R4, tab 60) At this time, Powertronic had missed the November 29, 2018 FA completion date.

22. On December 12 and 13, 2018, during a government visit to observe FA testing, the FAs failed electrical testing. In a December 19, 2018 email to Powertronic, CO Powers stated in part:

> From a contractual standpoint, we are obviously still concerned about the delinquency of the first articles and the overall impact to the production delivery schedule, as well as the additional technical problems. We do appreciate the preliminary failure analysis you provided. In order to receive government approval to move forward as a result of the rejected preproduction lot that failed testing the week of 12/10, per WS22017 Section 4.4.2.3, PSFI must provide an updated Root Cause Analysis. The update to the Analysis report must pinpoint the direct cause of the failure experienced during electrical testing along with the identified corrective action for the reworked/rebuilt switches that characterize the 20 preproduction units (along with the corrective action to be taken for potential future switch production lots assuming successful qualification).

(R4, tab 61 at 1)

6

23. On January 2, 2019, Powertronic notified Navy of additional problems (R4, tab 63 at 4). Specifically, Powertronic had problems repairing the failed switch, requiring remanufacture of a subcomponent (Bellville spring) and welding of the switches (*id.*).

24. On February 6, 2019, Powertronic provided a fifth revised schedule (R4, tabs 73-74). This schedule indicated that FA Production was 99% complete, FA Testing was 0% complete and delivery of the FA test report was predicted between June 24 and July 15, 2019 (R4, tab 74 at 1).

25. On March 13, 2019, Ms. Moosmiller transmitted a Letter of Concern to Powertronic (R4, tab 80). In that Letter of Concern, CO Powers reminded Powertronic that the FAs, originally due in November 2018, were delinquent. CO Powers stated in part:

> Over the last year we have had repeated discussions about schedule concerns, not just delinquency of the FAs, but also flow of milestones and durations, which appear to show a lack of understanding of the requirement. You have encountered numerous and continual technical issues, including incorrectly thinking redesign of a switch was necessary due to a psi pressure requirement, rubber diaphragm vacuum leak issues, Belleville/snap action disk design, failed electrical isolation tests, failed vibration tests, etc. These issues, and others, are set forth in more detail in Enclosure 1, Contract Timeline of Events. All of these issues have led to significant schedule delays.
>
> Given that PSFI is a HubZone small business concern, the Government will provide PSFI the opportunity to reset the delivery schedule, in exchange for the consideration of PSFI's proposed $24,000 reduction in FA pricing. It has been agreed that the new schedule is a realistic representation of delivery that can be relied upon for planning and scheduling purposes.
>
> . . . .
>
> After bilateral modification of the contract terms and conditions, PSFI will be contractually bound to the new schedule set forth in the contract. Any deviation from this

schedule, or any failure to make progress without an excusable delay would thereby be considered grounds to begin a contract termination for default.

(R4, tab 81 at 1-2)  The letter enclosed a more detailed account in a 7-page "Timeline of Events, 02 February 2019 through 01 March 2019" chronology (R4, tab 82).  The letter also enclosed a proposed bilateral modification extending the delivery schedule in exchange for $24,000 consideration.  The FA Clause was changed to require the FA test report submitted "by 7/15/19."  (R4, tab 83 at 9)

26.  The parties, Mr. Durost, CEO Powertronic, and CO Powers signed the modification[2], effective March 13, 2019, that was enclosed with the Letter of Concern (R4, tab 87).  Modification No. P00002 changed the delivery date for FA CLIN 0001AA from November 29, 2018 to June 24 2019, an extension of seven months (R4, tab 87 at 3-4).

27.  On April 1, 2019, Powertronic provided the final corrective action report and a sixth revised schedule (R4, tabs 90-92).  The schedule showed that FA production was 100% complete and that "Oil Reservoir" testing was 100% complete except for "Random Vibration Ambient" testing (R4, tab 91).  The rest of the FA testing was 0% complete even though the FA report was scheduled to be submitted on July 15, 2019 (*id.*).

28.  On April 4, 2019, Powertronic provided notice that Dayton T. Brown (DTB), its testing contractor, was not able to start acceleration testing as planned, and that as DTB was also performing the shock testing, Powertronic would not be ready for Mr. Cole to visit the following week (R4, tab 95).

29.  On April 5, 2019, CO Powers issued a Cure Notice to Powertronic regarding Contract No. N00253-18-C-0003 (R4, tabs 93-94).  In the Cure Notice, CO Powers recited Powertronic's additional delays and failures since the recent bilateral modification.  Specifically, Powertronic had not timely provided the corrective action report; had not timely shared information about its vibration test data or its subcontracting issues as promised on March 14; and had encountered additional problems obtaining information from DTB.  CO Powers took into account that Powertronic was a HubZone small business, "As PSFI is a HubZone small business, the government has tried to give PSFI every opportunity to remedy the issues and delays, including the opportunity to agree on extended delivery dates."  (R4, tab 94 at 1-2)  CO Powers also noted the accompanying schedule slip and inaccuracy, noting that completing the 90-day shelf life test, itself, which had not yet started, would necessarily place Powertronic behind the newly extended FA delivery date (*id.*).  As such, timely FA delivery was impossible (*id.*).

---

[2] The image at R4, tab 87 does not have a Modification No. but it is the second modification in the record so should be P00002.

30. CO Powers stated that in light of the continued testing issues, errors and inaccuracies, the government was unable to rely on Powertronic's schedule and did not believe it would meet the "delivery dates" (R4, tab 94 at 1-2). She advised Powertronic that unless this failure to make progress was cured, Navy may terminate the contract for default (*id.*).

31. On April 11, 2019, Powertronic inquired of DTB about its progress with testing (gov't mot. to supp. record, ex. 6 at 4). On April 12, DTB responded that it was "having an issue" achieving the 75g 50ms shock pulse (*id.* at 3). DTB provided the data of what it said was "the best it could do," and asked if it was acceptable (*id.*).

32. On April 12, 2019, Powertronic responded to DTB, "[w]ho does this quoting," saying that "this is twice now a deviation had to be made" (gov't mot. to supp. record, ex. 6 at 3). DTB responded that it didn't believe DTB had actually quoted the 75g test (*id.* at 2).

33. On April 16, 2019, Powertronic forwarded DTB test information to Mr. Cole and asked if it would be acceptable, noting that he assumed it would not be because the shock pulse was out of tolerance (R4, tab 98 at 1-2). On April 17, Powertronic shared the information with Ms. Moosmiller as well with a similar message, asserting that this was "the last input needed for the 'cure notice' to be cured (or the symptoms to be managed in the least)" (*id.* at 1). Ms. Moosmiller responded that she was working on an answer, noting that Powertronic should not delay a cure notice response waiting for it (*id.*).

34. On April 18, 2019, Ms. Moosmiller confirmed that the DTB results were not within the specifications and therefore were not acceptable (R4, tab 100).

35. On April 25, 2019, Powertronic informed Ms. Moosmiller and CO Powers that DTB still had the switches, had completed that acceleration testing on April 8, and yet was "just now" performing the shock testing (R4, tab 101 at 1). Powertronic stated it was proposing a new, different subcontractor NTS for the 75g 50ms shock test, and verifying its equipment (*id.*). Powertronic stated that even though "[t]he cure notice is still pending the final home/timing of the 75g pulse," which it hoped would be completed next week, it wanted to give "the gist of what it will propose" (*id.*). Specifically, Powertronic: 1) asserted that production was "on track" for the first production lot of pressure switches; 2) requested that the government grant a conditional FA approval after 30 days of shelf-life test, stating that it would provide all of the FA test data once complete; and 3) proposed that PSFI proceed with production lot testing while the remainder of the shelf-life test was completed (*id.*).

36. Then, on May 3, 2019, Powertronic notified Mr. Cole that it was unable to find a lab to perform the 75g 50ms shock test (R4, tab 102 at 1). Powertronic asked for

insight on previous contractors' approach (*id.*).  Mr. Cole did not respond to the email but did share it with Ms. Moosmiller and CO Powers (*id.*).

37.  On May 22, 2019, CO Powers approved a Business Clearance Memorandum (BCM) prepared by Ms. Moosmiller, determining to terminate the contract for default (gov't mot. to supp. record, ex. 3 at 1-3).  The BCM recited the troubled history of the contract as per the Letter of Concern and the Cure Notice, up through and including Powertronic's May 3 notification of inability to perform the 75g shock test (*id.* at 11-13).  The BCM noted that bilateral Modification No. P00002 extended delivery dates, however Powertronic "immediately experienced new technical issues and new schedule delays (*id.* at 12).  CO Powers stated, "[u]sing correct milestones, the delays incurred after the delivery date extension have rendered submission of FAs in accordance with that new date impossible" (*id.* at 13).

38.  The BCM documented consideration of the seven FAR 49.402-3(f) factors to determine whether to terminate a contract for default (*id.* at 13-16).  In FAR Factor 2, the Specific Failure, CO Powers noted that Powertronic had not submitted a formal response to the cure notice and only provided informal notice of new delays (*id.* at 14).  CO Powers specifically cited Powertronic's "history of continual problems and issues," found that the recently identified problems with Powertronic's vibration equipment, testing arrangements with DTB, and its apparent inability to accomplish some testing had not been shown to be excusable (*id.*).  She concluded that "the Government sees no reasonable likelihood of completion with the degree of work remaining" (*id.*).  FAR Factor 5, Essentiality of the Contractor, states that Powertronic was "delinquent on over 40% of open contracts" (*id.* at 15).  After considering these FAR Factors, CO Powers concluded, "In considering the above factors, a Termination for Default is necessary to document the contractor's significant performance and progress failures, protect the Government's interests, and to obtain the mission required items" (*id.* at 16).  CO Powers final determination was, "Based on the above [BCM], it is determined to be in the best interests of the Government to Terminate for Default . . ." (*id.*).

39.  On June 11, 2019, CO Powers issued the termination for default notice to Powertronic (R4, tabs 103-04).  The termination notice identified Powertronic's failure to make progress, noting the inability to meet the FA delivery date, and the failure to provide a response to the Cure Notice, as the basis for the termination.  CO Powers stated, "[a] s such, the Government sees no likelihood of timely completion with the degree of work remaining."  (R4, tab 104 at 1)

40.  On June 29, 2019, Powertronic notified the Navy that it had been able to complete the remainder of the FA testing, not including the storage-life test (R4, tab 106 at 1).  Powertronic faulted DTB for the issues with the shock test, saying that "the subcontractor quoted this test, not only once but back in 2016" (R4, tab 104 at 1).  On

July 9, 2019, CO Powers emailed Powertronic stating, "[w]e will not be reconsidering/revising the termination for default or reinstating the contract" (*id.*).

41. Powertronic appealed the termination and the Board docketed the appeal as ASBCA No. 62174.

## DECISION

*Preliminary Comment*

Powertronic presents a litany of problems it encountered which we accept at face value. The record is replete with evidence of Powertronic's problems performing the contract. (Findings 9, 11-15, 18-24, 27-28, 34-36) To be fair and thorough, we address problems[3] cited by Powertronic one-by-one, but arrive at the conclusion that none rise to the level of a defense to Powertronic's default. Also, Powertronic submitted several supplemental affidavits by Mr. Durost, CEO, to support its conclusions. While the Board accepted Mr. Durost's affidavits, they were not accompanied by amendments to the Powertronic's briefs explaining their significance.

*The Navy Established a Prima Facie Case Supporting Termination*

Termination for default is a government claim and the government has the burden of proof. However, it can be fairly easy for the government to meet its initial burden by simply proving that the contractor failed to deliver on time:

> The government has the burden of proof in a termination for default case. *New Era Contract Sales, Inc.*, ASBCA No. 56661 *et al.*, 11-1 BCA ¶ 34,738 at 171,022. Normally, once the government proves failure to make timely delivery, it satisfies its burden to make a prima facie case of default and the burden shifts to the contractor to prove an excuse. *Id.* (Failure to make timely delivery establishes a prima facie case for termination for default).

*DODS, Inc.*, ASBCA No. 57667, 13-1 BCA ¶ 35,203 at 172,715; *see CKC Systems, Inc.*, ASBCA No. 61025, 19-1 BCA ¶ 37,385 at 181,750.

First Articles are not production deliverables; however, they are deemed to be deliverables for the purpose of termination for default. FAR 52.209-3, FIRST ARTICLE

---

[3] We considered all matters put forward by Powertronic to support converting the termination to one for convenience, those not specifically discussed herein were considered, but not found persuasive.

APPROVAL - CONTRACTOR TESTING (SEP 1989) - ALTERNATE I (JAN 1997) reads in part:

> (d) If the Contractor fails to deliver any first article report on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of this contract.

(R4, tab 1 at 46)  We have long enforced this provision:

> Under Contract 1189's First Article clause, if the CO disapproves any article, the contractor shall be deemed to have failed to make delivery within the meaning of the Default clause of the contract.  FAR 52.209-4(d); *FXC Corporation*, ASBCA No. 33904, 91-2 BCA ¶ 23,928 at 119,872 (holding termination for default proper when contractor failed to satisfy contract's first article requirements and failed to prove its FAT failures were minor).

*YONIR Technologies, Inc.*, ASBCA No. 56736, 10-1 BCA ¶ 34,417 at 169,898; *Scapco, Inc.*, ASBCA No. 17629, 73-2 BCA ¶ 10,106.

It is clear that Powertronic failed to make adequate progress toward completing FA testing, that a cure notice was issued as required by FAR 52.249-8(a)(2), and ultimately Powertronic failed to complete FA testing after Modification No. P00002 extended the FA testing completion date (findings 2, 15-18, 24-26, 35-38).  We find that the Navy has established a prima facie case that it's termination for default was proper.  Therefore, this case gets down to seeing if Powertronic's failure to complete FA testing was legally excused.[4]

*The Delivery of GFE does not Excuse Default*

The Navy was to provide a "whole pump assembly" as GFE for "mounting purposes" (findings 7, 11, 13).  We were unable to find a GFE delivery date in the contract and the Navy states, "[t]he contract does not set any delivery date for that equipment.  R4 File, Tab 15."  (Gov't opp'n br. at 6)  Without a contractual delivery date, we find that the GFE had to be delivered so as not to delay FA testing.  Powertronic

---

[4] We could limit our inquiry to issues occurring after Modification No. P00002, effective March 13, 2019, however, we think it is helpful to deal with problems raised by Powertronic occurring before Modification No. P00002 because they provide context for Powertronic's later problems (finding 26).

12

contends, "[w]ithout timely delivery of the GFE, Powertronic's ability to test the first article was delayed . . . . The Navy did not provide the GFE in a timely manner. (Durost Aff. ¶ 14)." (App. br. at 5 ¶ 9, 6 ¶ 10)  Powertronic states the GFE was delivered on June 4, 2018 (app. br. at 6 ¶ 11).  The Navy documents that the GFE was delivered by August 7, 2018 (finding 13).  Powertronic contends, "The delay in GFE delivery substantially delayed Powertronic's ability to timely perform the Contract (Durost Aff. ¶ 16)" (app. br. at 6 ¶ 12).  In a schedule submitted on August 21, 2018, Powertronic reported that the FA units were only 2% complete (finding 14).  At 2%, the FA units were nowhere near ready for testing that was due on November 29, 2018 (finding 8).  CO Powers estimated that FA "delivery" might not occur until April or May 2019 (finding 16).  April 2019 is approximately nine months after the GFE was delivered on June 4, 2018.  Powertronic fails to point us to anything in the contemporaneous record where it alleged the GFE was not suitable for its intended purpose.  On June 29, 2019, Powertronic notified the Navy it had completed FA testing[5] except for the storage life test (finding 40), ten months after GFE delivery on June 4, 2018, and after termination on June 11, 2019 (finding 39).  Accordingly, we hold the GFE did not delay FA testing and is no excuse for default.

*A Worldwide Supplier Shortage of "Viton" Does Not Excuse Default*

Powertronic contends the following:

> On or about October 23, 2018, Powertronic learned that there was an unforeseeable world-wide shortage of low-temperature Viton, a product needed to create the rubber diaphragm for the oil-pressure switches.  (*See* Exhibit G to Durost Aff.  (POWER-000229).)  The use of Viton on the diaphragm was recommended because the product Viton replaced had a tendency to swell and eventually leak, causing a failure.  (Durost Aff. ¶ 17)
>
> . . . .
>
> Powertronic worked diligently to obtain the low-temperature Viton necessary for the production of the switches, but the unforeseeable shortage delayed Powertronic's ability to deliver the first article by a number of weeks. (Durost Aff. ¶ 18)

(App. br. at 6-7 ¶¶ 13-14)  For the purpose of this decision we assume this allegation is accurate.  The delay caused by the shortage of Viton may be "unforeseeable," but that

---

[5] We have no idea if this was true.

characterization is not a defense to default.  It is Powertronic's burden of proof to establish it was impossible to acquire Viton and it did not even try.

We have held that unexpected shortage of Viton is not an excuse to default.  In *Bell Fasteners Corp.*, ASBCA No. 18691, 1974 WL 2230, it was stainless steel and we held:

> Performance of a contract is not excused merely by unusual or unanticipated expense.  Cf., *Anthony P. Miller, Inc. v. United States*, 161 Ct.Cl. 455 (1963).  In *Betsy Ross Flag Co., Inc.*, ASBCA No. 12124, 31 October 1967, 67–2 BCA 6688, this Board stated the matter (Ibid., at p. 31,025) as follows:
>
>> "Market shortage is not an excusable cause for nonperformance.  The fact that supplies cannot be obtained except at a cost in excess of the contract price is no excuse.  Unwillingness to perform, although at some loss, does not relieve an appellant from his contractual obligation.  *Minneapolis Scientific Controls Corp.* (ASBCA No. 9113, 23 November 1964), 65–1 BCA, Par. 4541; *Heinfeld Enterprises* (ASBCA Nos. 11838 and 11839, 24 January 1967), 67–1 BCA Par. 6102."

*Id.*  In *Beeston, Inc.*, ASBCA No. 38969, 91-3 BCA ¶ 24,241, it was monoethanolamine (MEA) a reaction product of ammonia and ethylene oxide (EO).  Fires and explosions at plants producing EO created shortages yet we held there were suppliers of EO, although at higher cost, that Beeston did not contact and no evidence EO was completely unavailable either domestically or worldwide that did not support impossibility of performance.  We also held that an 18.6% loss did not constitute commercial impracticability.  We held that a fixed price contract places the risk of unavailability of materials upon the seller/contractor.  *Id.* at 121,221-222.

*Failure of the Honeywell Snap Action Switch Does Not Excuse Default*

In December 2018 Powertronic encountered a failure of a "Snap Action Switch" during testing of the oil-pressure switches.  Powertronic states:

> Powertronic worked diligently to obtain new snap action switches from Honeywell and subject those switches to testing.  However, this unforeseeable failure of the snap action switches supplied to Powertronic prevented Powertronic from delivering the first article according to the

schedule. Among other things, Powertronic had to purchase additional connectors, which required an 18-week lead time to acquire, to be ready for production. (Durost Aff. ¶ 20)

(App. br. at 7 ¶ 16)

Honeywell is a subcontractor supplying parts, one of which, the snap action switch, failed during testing. It is well established that default is justified when the fault lies with a subcontractor:

> She also evaluated Delfasco's response to the 20 September 2013 show cause letter and found its deflection of blame to Trinity to be an unpersuasive argument against finding default, since default is justified when the fault lies with the contractor or its subcontractor.

*Delfasco LLC*, ASBCA No. 59153, 17-2 BCA ¶ 36,659 at 178,523. The defective Honeywell snap action switch which, according to Powertronic, necessitated an "18-week lead time to acquire, to be ready for production" does not excuse Powertronic's failure to make progress and complete FA testing.

*Powertronic's DO-C9 Rating Does Not Excuse Default*

The Navy effectively dealt with this argument in its Opposition Brief that is unrebutted and we adopt:

> Similarly, with regard to DPAS, Appellant was itself obliged not to take on the instant contract if performing it was to interfere with other rated orders. 15 C.F.R. § 700.13(b). Further, if Appellant found itself in a situation where it was unable to resolve conflicting rated orders itself, it was obliged to present that to the contracting officer and seek special priorities assistance, which Appellant did not do. 15 C.F.R. § 700.14(c)(2); 15 C.F.R. § 700.50(a); Dep't of Defense Priorities and Allocation Manual, DoD 4400.1-M (Feb. 21, 2002), Sections C5.1-5.3.

(Gov't opp'n br. at 6) Powertronic failed to follow procedures and failed to prove that other rated contracts caused its default or that it should have taken the contract in the first place.

15

*Powertronic's Difficulty in Finding Shock Testing is not a Defense to Default*

In its brief, Powertronic agrees that the contract requires shock testing: "[t]he Contract's specifications provided that the oil-pressure switches must be able to achieve 75 g 50 ms pulse tolerance during shock testing" (app. br. at 9 ¶ 23). Powertronic explains that it contacted testing vendors but each vendor was unable to perform the 75g 50 ms test. Powertronic asked the Navy for assistance but received none (app. br. at 9-10 ¶ 26-28). However, it is Powertronic, not the Navy, that is responsible for shock testing. Eventually, at the time of the termination, Powertronic contends it was able to pay vendor DTB to perform the testing (app. br. at 11 ¶ 34). As we discussed above in the snap action switch section, such problems caused by subcontractors are not a defense to default.

*Modification No. P0002*

The parties signed bilateral Modification No. P00002, effective March 13, 2019, extending the FA delivery date from November 29, 2018 to June 24, 2019, an extension of seven months (finding 26). The Navy correctly argues:

> As the ASBCA has repeatedly held, a bilaterally agreed-upon extension of time constitutes a surrender of any right to argue excusability of then-existing causes of delay, either affirmatively or as a defense to a default. *Do-Well Machine Shop, Inc.*, ASBCA No. 34565, 99-1 BCA ¶ 30,320 at 149,946 (citing cases). As such, when Respondent and Appellant entered into a bilateral agreement in March 2019 to extend the 300-day delivery date for FAs another approximately 7 months (Proposed Findings of Fact, ¶ 51), any delays occurring prior to that agreement were waived and no longer pertinent to the ultimate termination decision.

(Gov't br. at 24)

Even though above we went through some of Powertronic's problems, we did so to see if there was any argument that might survive Modification No. P0002. We did not find any. The Navy is correct, Modification No. P0002 renders moot all of the problems Powertronic encountered before March 13, 2019. We want to reiterate that we took Powertronic's itemization of problems and Mr. Durost's affidavits at face value, not looking for corroboration, however, none of them constituted a defense to Powertronic's default.

Unfortunately, after Modification No. P0002, March 13, 2019, it was business as usual with Powertronic. On April 4, 2019, Powertronic notified the Navy that it was still

16

having difficulty with shock testing that was holding up completion of FA testing. (Finding 28)[6] On April 5, 2019, CO Powers, pursuant to FAR 52.249-8(a)(2) (finding 2) issued a cure notice to Powertronic referring to its failure's and stating, "unless this failure to make progress was cured, Navy may terminate the contract for default" (finding 30).

On April 12, 2019, DTB informed Powertronic that it was unable to achieve the 75g 50ms shock test. DBT submitted its test data and asked if it was acceptable. (Finding 31) On April 16, 2019, Powertronic submitted DBT's data to the Navy (finding 33). On April 18, 2019, Ms. Moosmiller confirmed that DTB's test results were not within the specifications and therefore were not acceptable (finding 34).

On April 25, 2019, Powertronic responded stating DTB was "just now" performing shock testing and suggesting that it proceed with "production" and that it would submit FA test data "once complete." Apparently, Powertronic didn't appreciate that production was contingent on successful FA testing. Powertronic also suggested replacing DBT with a new shock subcontractor. (Finding 35) So, on April 25, 2019, two months before the revised FA "delivery" date of June 24, 2019, Powertronic still had not completed shock testing, was considering a new shock testing subcontractor and apparently wanted to start production[7] (finding 35).

On May 3, 2019, Powertronic informed the Navy it was unable to find another shock subcontractor and asked for "'insight on previous contractors' approach" (finding 36). We hold that it was not the Navy's responsibility to respond to Powertronic's request, especially in view of the performance record before us.

*HUBZone Status was Considered*

At all times relevant Powertronic was a small HUBZone contractor (finding 3). The Navy specifically referenced and took into account this status in the record (findings 25, 29). This is especially true when the Navy agreed in Modification No. P00002 to establish a new schedule effectively giving Powertronic a second chance to perform:

> Given that PSFI is a HubZone small business concern, the
> Government will provide PSFI the opportunity to reset the

---

[6] We did not consider Powertronic's talk of production quantities because Powertronic had no right to proceed with the production quantities before FA approval or conditional approval. It of course had the right to proceed at risk, but that has no bearing on the termination.

[7] There is no evidence that the Navy ever considered authorizing production before FA approval.

17

delivery schedule, in exchange for the consideration of PSFI"s proposed $24,000 reduction in FA pricing.

(Finding 25)  In the April 5, 2019 cure notice, CO Powers again took into account that Powertronic was a HubZone small business, "As PSFI is a HubZone small business, the government has tried to give PSFI every opportunity to remedy the issues and delays, including the opportunity to agree on extended delivery dates" (finding 29).

*The Business Clearance Memorandum* (*BCM*)

Based on the facts presented above, the Navy was understandably frustrated with Powertronic's lack of progress during the entire contract and particularly after the Navy had agreed to reset the FA delivery schedule in Modification No. P00002, a move that gave Powertronic a reprieve from its default.  The BCM documents that Powertronic failed to adequately respond to the cure notice and failed to establish that its shock testing failures were excusable (finding 38).  In any event, on May 22, 2019, CO Powers approved a BCM justifying termination for default (finding 37).

We carefully reviewed the BCM and find it comprehensive, fair and puts to rest Powertronic's allegations of abuse of discretion (findings 37-38).  There is no support for Powertronic's argument that, "[t]he termination for default must be reversed because the Navy did not estimate the total time it would take Powertronic to complete the Contract, or how long it would take a follow-on contractor to perform the same work, as required by the FAR and applicable law" (app. br. at 18).  This may be a consideration available to the contracting officer, but Powertronic's long and problematic record does not support Powertronic's bare assertions that CO Powers abused her discretion.  If anything the record supports the conclusion that CO Powers bent over backwards in an attempt to see Powertronic succeed.  However, there comes a time when enough is enough and that time was documented in the BCM and when the contract was terminated on June 11, 2019 (finding 39).

*Termination for Default*

On June 11, 2019, CO Powers terminated Powertronic's contract for default for failure to make progress (finding 39).  The termination complied with FAR 52.249-8(a)(1)(ii) and (a)(2) in that Powertronic failed to make progress, so as to endanger performance of this contract and failed to cure the failure (findings 2, 38; R4, tab 104)  We agree with CO Power's conclusion:

> Act or omission constituting default includes failure to make appropriate progress to meet the 24 June 2019 delivery date for First Articles.  Also, you failed to respond to the Cure Notice delivered on 05 April 2019.  As such, the Government

18

> sees no likelihood of timely completion with the degree of
> work remaining.

(R4, tab 104 at 1)  Essentially, based on the facts itemized in our findings, over the fifteen month period from contact award on February 2, 2018 (finding 8) to termination on June 11, 2019 (finding 39), Powertronic exhausted its credibility with the Navy.  We hold that Powertronic unjustifiably failed to make progress and failed to adequately respond to the cure notice rendering FA testing completion practically impossible.  The termination was justified.

## CONCLUSION

Based on the above, Powertronic's appeal is denied.

Dated:  May 10, 2021

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62174, Appeal of Powertronic Systems Florida, Inc., rendered in conformance with the Board's Charter.

Dated:  May 12, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
